## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| CREATIVE PRODUCTS INTERNATIONAL, INC.; ITEAM, LLC; and DAVE MAURER, | ) ) ) |
| Plaintiffs, | ) ) |
| | )    Case No. 26-cv-823 |
| vs. | ) ) |
| I-TEAM NORTH AMERICA, INC.; I-TEAM GLOBAL B.V.; I-INVEST B.V.; I-TEAM PROFESSIONAL, B.V.; FUTURE CLEANING TECHNOLOGIES, B.V.; FRANK VAN DE VEN; PETER DE ROO; and CHAD HARMSEN, | )    **JURY TRIAL DEMANDED** ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs, CREATIVE PRODUCTS INTERNATIONAL, INC., ITEAM, LLC, and DAVE MAURER (collectively referred to as "Plaintiffs"), by and through their attorneys and for their Complaint against Defendants I-TEAM NORTH AMERICA, INC., I-TEAM GLOBAL B.V., I-INVEST B.V., I-TEAM PROFESSIONAL, B.V, FUTURE CLEANING TECHNOLOGIES, B.V., FRANK VAN DE VEN, PETER DE ROO and CHAD HARMSEN (sometimes collectively referred to as "Defendants"), hereby state as follows:

### NATURE OF ACTION

1.    Plaintiffs in this action seek redress for among other things, the Defendants' patent and trademark infringement, unfair competition, shareholder oppression, civil conspiracy, defamation *per se,* breach of contract, and conversion.

1

2.      As set forth more fully below, Defendants have engaged in a pattern and continuing course of wrongful conduct to enrich themselves at the expense of Plaintiffs and have caused and will continue to cause substantial and irreparable injury to Plaintiffs.

3.      More specifically, certain Defendants induced Plaintiffs to give them access to valuable assets and services by touting a joint venture, i-team North America, Inc. (in which Plaintiffs held a 49% shareholder interest), under the guise that they would prosper collectively, beyond levels that they could prosper individually.  Instead, one or more of the Defendants used their control over the joint venture to change the deal in the Defendants' favor at every turn, stripping i-team North America, Inc., of those assets and opportunities, and taking those assets and opportunities for themselves.  Profits, indeed, materialized, but were hoarded by Defendants.

4.      Defendants' conduct has been willful and systematic, warranting both provisional and permanent injunctive relief as well as compensatory and punitive damages.

## PARTIES

5.      Plaintiff Creative Products International, Inc. ("CPI") is a corporation organized and existing under the laws of the State of Michigan.  CPI is a leader in the development, manufacturing and sale of cutting-edge industrial microfiber cleaning equipment and supplies and holds twenty-seven (27) domestic and foreign patents and registered trademarks in connection therewith.

6.      Plaintiff iTeam, LLC ("iTeam") is a limited liability company organized and existing under the laws of the State of Michigan.

7.      Plaintiff Dave Maurer ("Maurer") is an individual who is a citizen of and domiciled in Colorado.  Maurer is the sole shareholder, director and officer of CPI, and the sole member and manager of iTeam.

8.     Defendant Frank van de Ven ("Frank"), is an individual who is a citizen of and domiciled in the Netherlands.  Frank has a background in finance, and through entities that he (directly or indirectly) purchased or started, is engaged in the business of manufacturing and selling industrial cleaning supplies and equipment throughout the world.  Frank regularly traveled to the United States and to Michigan, specifically (on multiple occasions), in connection with his business interest, including i-team North America, Inc. (discussed below).

9.     Defendant i-team Global B.V. ("Global"), is a foreign corporation, formed on information and belief under the laws of the Netherlands.  Frank, through a complicated tree of holding companies, owns a thirty-nine percent (39%) stake in Global.  On information and belief, Frank is a director and the principal officer of Global and controls all aspects of its operations.

10.     Defendant Future Cleaning Technologies, B.V. ("FCT") is a foreign corporation, formed on information and belief under the laws of the Netherlands. FCT was the main parent/holding company before Global was created.  FCT is now owned by Global. On information and belief, Frank is a director and the principal officer of FCT and controls all aspects of its operations.  To third-parties, including CPI, FCT and Global operated almost interchangeably.

11.     Defendant i-invest B.V., ("i-invest") is a company formed in the Netherlands. On information and belief, Global and/or Frank owns at least a 50% stake in i-invest, which is also controlled by Frank.

12.     Defendant i-team North America, Inc. ("ITNA") is a Michigan corporation, that operates out of principal offices in Holland, Michigan.  ITNA is the successor to i-SolutionsUSA, LLC, a Michigan limited liability company formed in 2018, that now does business under the assumed name "i-team North America," then formally changed its name to i-team North America, Inc., in 2019, before converting to a c-corporation in or about January 1, 2019 for tax purposes.  i-

Invest owns a fifty-one percent (51%) shareholder interest in ITNA. CPI owns the remaining 49% shareholder interest in ITNA.

13.    Defendant i-team professional, B.V. ("ITP"), is a foreign corporation, formed on information and belief under the laws of the Netherlands. ITP is owned by Global. On information and belief, Frank is a director and the principal officer of ITP and controls all aspects of its operations.

14.    Defendant Peter de Roo ("Peter") is an individual who is a citizen of and domiciled in the Netherlands. During relevant times Peter served as President of ITNA, during which he took directions from Frank. During his tenure as ITNA's President, Peter traveled frequently between the Netherlands and Holland, Michigan.

15.    Defendant Chad Harmsen ("Chad") is an individual who is a citizen of and domiciled in the state of Michigan. During relevant times Chad served as Customer Service Manager of ITNA, during which he took directions from Frank and Peter.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, predicated upon infringement of patents in violation of 35 U.S.C.A. § 271, and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1051, *et seq*. This Court has pendant jurisdiction pursuant to 28 U.S.C. § 1367 as to the remaining claims.

17.    Venue is appropriate in this district pursuant to 28 U.S.C. §1391(b) in that a substantial part of the events and omissions giving rise to the claims occurred within this judicial district, Defendants have substantial contacts with this District, and Defendants have caused damage in this District.

## FACTS COMMON TO ALL COUNTS

18.    Maurer has an engineering background and has spent most of his career in the commercial cleaning industry, having developed cleaning systems for a nationwide cleaning and restoration company, developed a myriad of cleaning products for specific surfaces and industries, and established distribution networks for commercial cleaning products and equipment.

19.    Maurer and Frank have been professional acquaintances since 1993, when Maurer was employed in the Chicago area by ServiceMaster, a commercial cleaning service catering to businesses throughout the United States and Canada.  Maurer oversaw sourcing commercial cleaning equipment for ServiceMaster and purchased certain upright vacuums from a company (i-vac B.V.) that Frank had purchased.

20.    In 1997, Maurer joined a start-up called US Floor formed as the US sales arm of an Italian manufacturer of commercial scrubbing products (namely, an 18" upright micro-scrubber and a 28" riding scrubber).  Maurer worked with Frank to add the i-vac upright vacuums to the US Floor product line.

21.    In 2000, Maurer went to work for Geerpres, Inc., another supplier of industrial and commercial cleaning equipment that serves all North America.  Maurer again worked with Frank to add the i-vac upright vacuums to Geerpres' product offering.

22.    In 2003, Maurer co-founded CPI to build on his expertise, and sold i-vac's vacuums, including securing several substantial private label deals.

23.    By 2010, Maurer was the sole owner of CPI, which began to turn its attention to expanding its offerings by developing its own line of microfiber-based products, that absorb and hold more cleaning solution (without drips) than other forms of cleaning mops and cloths, wet or dry, thereby offering unsurpassed performance, effective at removing 99.9% of surface bacteria from ceilings, walls, furniture, floors and baseboards *without* chemicals, and equally effective at

*holding* that collected dirt, dust and bacteria throughout the cleaning process to keep the air equally clean.

24.    CPI began marketing its line of microfiber products as a revolutionary four-dimensional, or 4D Clean<sup>TM</sup> Technology (the four dimensions being walls and furniture, floors, ceilings and air), and invested substantial sums to promote the concept of 4D Clean<sup>TM</sup> Technology, which to those involved in the commercial cleaning industry has become synonymous with CPI's offering of microfiber products.

25.    CPI's microfiber products also offered greater ease of use, requiring limited water or chemicals during use, and releasing all soil and bacteria after use during washing, thereby substantially improving staff productivity, time and money.

26.    CPI is the owner by assignment of all right, title, and interest in and to United States Patent No. 9,713,412 (the "Cleaning System Patent") which is valid, enforceable, and was duly issued by the United States Patent and Trademark Office.  A copy of the Cleaning System Patent issued by the United States Patent and Trademark Office is submitted herewith as **Exhibit A.**

27.    The Cleaning System Patent includes a patented mop head having a cleaning surface and a mesh backing member.

28.    CPI is also the owner by assignment of all right, title, and interest in and to United States Patent No. 9,957,725 (the "Multi-Purpose Cleaning Trowel Patent"), which is valid enforceable, and was duly issued by the United States Patent and Trademark Office, as well as patents duly issued by analogous authorities in Canada (Patent #  2938954), the United Kingdom (Patent # 3104762), the Netherlands (Patent # 3104672), Italy (Patent # 502021000000632), Germany (Patent # 602014071119.7), and France (Patent # 3104762).  A copy of the Cleaning System Patent issued by the United States Patent and Trademark Office is submitted herewith as **Exhibit B.**

29.    The  Multi-Purpose Cleaning Trowel patent includes a cleaning trowel having a base having a first side, a second side, a flexible section, a blade section, and a mounting section between the flexible section and the blade section.  The cleaning trowel also includes a handling device on the first side of the base at the mounting section, and a cleaning pad receiving region on the base.

30.    Collectively, there are approximately fifty (50) microfiber products (each with its own product skew), twenty-seven (27) of which are manufactured, marketed and sold using and/or incorporating CPI patents and/or trademarks.

31.    The CPI microfiber products, including the patented Cleaning System and Multi-Purpose Cleaning Trowel (collectively the "CPI Microfiber Products") are manufactured for CPI by multiple third-party companies in Asia. CPI owns the molds and tooling required to manufacture the CPI Microfiber Products.

32.    CPI historically sold its products to distributors through independent sales representatives, each of whom had assigned territories, and CPI paid commissions to those representatives in connection with the sales they secured.  Those distributors, in turn, sold to end users (primarily facility managers and environmental cleaning services).

33.    The demand for CPI Microfiber Products grew quickly, and in short order generated a substantial portion of CPI's revenue.

34.    In or about 2014, as Frank witnessed the surging demand for CPI Microfiber Products, he solicited Maurer's assistance in FCT's development of a new product in commercial cleaning/sanitizing, utilizing patented technology (in Europe) that Frank had licensed from a German inventor.

35.     The patented technology would serve as the core of the i-mop®, a revolutionary product in commercial cleaning/sanitizing which was a combined vacuum and micro scrubber for hard floors, both of which technologies Maurer had proven success in engineering and sales.

36.     In connection therewith, Maurer worked with FCT (and eventually Global) and its affiliate in China, to which he made frequent visits at his own costs, on the design and testing of the product, drawing on his extensive experience with end-user needs and references selling vacuums and micro scrubbers for US Floor and other companies.

37.     Maurer helped lead a team of engineers in the development of i-mop®, designing the product to meet the practical needs of commercial cleaning crews.  Maurer also sourced the optimal components, including the brushes used for the finished i-mop® product.

38.     Maurer even helped Frank design the building in China in which the i-mop® was manufactured, providing extensive input with respect to design elements to manage workflow and the addition of a multi-surface training area.

39.     Frank, through FCT, started selling the i-mop® in or about late 2014 or early 2015. There were multiple issues during the early stages, and Maurer continued to make trips to China to address and correct problems in the i-mop® and assembly line. On information and belief, at some point after i-mop® sales began (the precise date being unknown to Plaintiffs) Global also began selling i-mops®, directly and/or through one or more of its subsidiaries or affiliates.

40.     By the time i-mop® was ready for a full-scale roll-out, Maurer had already incurred $400,000 in out-of-pocket expenses in connection with i-mop®, for which neither Maurer nor CPI were ever reimbursed. Rather, in consideration for Maurer's considerable contributions to bringing the i-mop® to market, Frank, through Global, FCT and/or Frank, engaged CPI and agreed that it would have the exclusive North American (USA, Canada and Mexico) distributions rights for the i-mop® product.

41.      More specifically, Maurer and Frank agreed that CPI would purchase i-mops® at wholesale (CPI was offered extended payment terms so that it could maintain a suitable inventory of i-mops®) and was then to market the product to its network of distributors, who in turn would sell at retail to commercial end users.  This distribution arrangement was never reduced to a written distribution agreement, but the agreed-upon terms were reflected in numerous communications between Maurer and Frank.

42.      In reliance upon the projected benefits associated with these distribution rights, CPI devoted substantial time and invested substantial resources (beyond the $400,000 in unreimbursed expenses referenced above) to develop i-mop® and the market for the i-mop® in the USA, Canada and Mexico, building out a network of distributors, demonstrating and training distributors and end-users in the operation of the i-mop®.

43.      Among the expenses incurred, Frank insisted that CPI hire and train additional sales representatives (at an annual cost of approximately $600,000 to CPI) with respect to the i-mop® product to accelerate the growth of the nascent market for the i-mop® in the USA, Canada and Mexico.

44.      As part of  his marketing efforts, Maurer formed iTeam and rebranded some of the CPI Microfiber Products as "i" products (for example, i-fiber®), and obtained registered trademarks for the same, and CPI leveraged its reputation in the commercial cleaning industry to begin marketing an "i" suite of commercial cleaning equipment and products to its network of existing distributers as well as at i-team branded booths at tradeshows. This benefited i-mop® which, instead of appearing to the marketplace as a single stand-alone offering, was viewed as part of a signature product line of state-of-the-art cleaning products, offered and backed by a titan in the commercial cleaning industry.

45.     To meet quotas set or imposed by Frank, and create the impression that Global, FCT and/or ITP had increased sales and receivables for both borrowing and financial reporting purposes, Global, FCT and/or ITP often shipped full containers of unassembled i-mops® (among other equipment) to CPI for distribution, invoicing CPI for such excess inventory that it neither needed nor requested, at full cost (as if they had been fully assembled), even though CPI personnel had to dedicate substantial time and resources to assemble and/or update the units, and was not paid or reimbursed for any of this time spent or costs incurred.  When Maurer objected to having CPI invoiced for unwanted/unneeded inventory, Frank advised that immediate payment would not be necessary, directing CPI to simply carry the invoices on its books (where they would sit for years).  When Maurer requested that CPI be compensated for the work, Frank told him that he would take care of that later.

46.     CPI also was tasked with handling recurring defect issues and warranty claims during the early stages of the roll-out of the i-mop®.  In most cases, however, Global/FCT failed to timely address underlying defects in various components of the i-mop®, and thus, the replacement parts that Global and/or FCT would ship to CPI were often plagued by the same recurring defects. CPI was also not paid or reimbursed by Global or FCT for the extensive warranty or repair work.

47.     CPI sold roughly 3,000 i-mops® within the first 18 months, equating to more than $7,000,000 in sales.  CPI also sold other complementary cleaning equipment marketed by Global/FCT that used the same interchangeable battery as the i-mop®.  This line of complimentary equipment was branded and marketed as "i-range" products.

48.     Despite these robust sales, however, CPI did not realize actual profit due to the unreimbursed out-of-pocket expenses it incurred, the incremental expense of hiring (at Frank's

insistence) a team of salespeople chosen by Frank to replace CPI's independent sale representatives, and the sunken costs of assembling i-mop® units and making warranty repairs.

49.    Maurer also caused iTeam to break ground on a new $5M "Innovation Center" on property that it purchased in Holland, Michigan from which CPI planned to operate, which include state-of-the-art facilities to demonstrate the i-mop®, other i-branded products, showcase the benefits of 4D Clean™ technology,  and to develop new products.

50.    The Innovation Center was designed to feature twenty-five unique environments in which team members and customers could be trained and certified by industry experts on best practices for cleaning multiple surfaces with multiple products with 4D Clean™ Technology.

51.    CPI sales reached $15 million annually, nearly all of which was driven by sales of i-mop® and CPI Microfiber Products.  While i-mop® sales contributed approximately half of the referenced annual sales revenue, because of the incremental costs associated with its dedicated sales team and the unreimbursed work for warranty and repairs, CPI merely broke even on its i-mop® sales.

### *The 2018 "Heads of Agreement"*

52.    In 2016, Maurer and Frank both attended an ISSA tradeshow in Chicago where CPI was marketing the iTeam suite of products. ISSA holds itself out as the world's leading trade association for the cleaning, hygiene and facility management industry.

53.    At that tradeshow, and without *any* advanced notice or warning, Frank advised Maurer that CPI would no longer have i-mop® exclusive distribution rights in North America, and that instead, Frank had made a deal with Tennant Company ("Tennant"), a $1B cleaning equipment manufacturer, to which CPI would have to cede most of its i-mop® distribution rights.

54.    Ironically, the main reason that Tennant even showed any interest in i-mop® (most industrial equipment in Tennant's portfolio sell at prices between $10,000 and $100,000, vastly

more than the cost of an i-mop® unit, which as  typically $2900), was because CPI had successfully poached two of Tennant's biggest distributors--CleanSource Inc., and Bunzel/Wesclean Distribution, who began to aggressively promote i-mop®.

55.    Frank refused to provide a copy of the agreement with Tennant to Maurer or even show Maurer any portion of the agreement that related to or impacted CPI's rights or interests. Frank told Maurer, however, that Tennant's agreement with Global/FCT required it to purchase roughly $20M in i-mop® inventory, all of which was payable in advance of each container shipment, effectively financing Global's operations.

56.    Over the course of months, Maurer and Frank discussed and negotiated over what would be suitable consideration to CPI for its substantial investment of time and resources into the development of i-mop®.

57.    At one point, Maurer and Frank agreed (verbally) that Maurer would receive a 10% stake in FCT, but as Tennant's i-mop® sales began to ramp up, Frank reneged on the oral agreement before it could be reduced to writing.

58.    After many months, the parties agreed that CPI should receive $2 million to surrender its exclusive i-mop® distribution right, and instead to partner with Global to support Tennant as the primary distributor of i-mop®, culminating in a written and executed "Heads of Agreement," that was prepared by Frank or at his direction.  A copy of the Agreement (the "2018 Agreement") is submitted herewith as **Exhibit C**.  While initially drafted as a term sheet to be used to prepare a long form of agreement, the parties thereafter agreed to abide by the terms of the 2018 Agreement, as drafted.

59.    Pursuant to the terms of the 2018 Agreement, iSolutionsUSA LLC ("ISU") was formed, and i-invest was to contribute $2 million into ISU for a 51% interest in that Company, while  CPI received the remaining 49% interest in the Company in consideration for its surrender

of exclusive i-mop® distribution rights.  ISU, in turn, used $1 million to purchase access to CPI's customer list (except for Medline Industries, private label, laundry, and school customers), which the parties acknowledged in the 2018 Agreement generated nearly $4.5 million in annual sales to the listed customers at a gross margin of 45%.  CPI, in turn, was to invest $1 million into the build-out of the Innovation Center.

60.    Notably, Frank acknowledged to Maurer that CPI's willingness to cede its i-mop® distribution rights to Tennant was significant consideration to ISU, but that he did not want to mention Tennent in the 2018 Agreement, because Tennant was a publicly traded company with certain reporting and disclosure obligations that might complicate the entire arrangement.

61.    It was at Frank's insistence, therefore, that the 2018 Agreement be drafted to suggest that the principal asset being acquired by ISU was access to the CPI customer list (although it had marginal value), so as not to have to mention that CPI was ceding its valuable i-mop®.

62.    Indeed, access to the CPI customer list was barely useful to any experienced commercial cleaning professional as the identify of customers was easily ascertainable (ISSA actually sells similar lists for less than $500), as evidenced by the fact that Frank and Maurer had already agreed to permit ISU to distribute CPI Microfiber Product and share in the profits of both CPI Microfiber Products and i-range/i-mop® (the higher upside revenue for Maurer) before there was any discussion of access to CPI's customer list.

63.    The only actual cash contribution that i-invest made in connection with the 2018 Agreement was a $1 million payment to CPI earmarked towards the construction of the Innovation Center.  Thus, ISU was capitalized with $1 million, effectively contributed by CPI in exchange for its 49% interest in the Company.

64.    In recognition of the investment that CPI made to develop the market for i-mop®, ISU was given the right to market i-mop® to ten designated legacy CPI accounts (the "CPI Legacy

13

Accounts"). CPI advised its Legacy Accounts of its new partnership with Tennant, which would take over the distribution of i-mop®, and with ISU, which would focus on selling i-range equipment and CPI Microfiber Products.

65. Under the 2018 Agreement, CPI also retained the right to sell i-mop® units directly to Medline Industries, one of the nation's leading fully integrated medical product suppliers. Prior to Global's deal with Tennant, CPI was selling 300 i-mop® units annually to Medline and projected those sales to surge past 1000 units annually.

66. With respect to CPI's direct sales to Medline Industries, CPI sourced the i-mops® directly from FCT/Global at a fixed price for resale to Medline. This opportunity was a primary motivating factor in entering into the 2018 Agreement. CPI reasonably expected that Tennant's vast marketing resources would expand interest in and demand for the i-mop® from which CPI could capitalize through its exclusive with Medline, both with respect to i-mop® as well as its CPI Microfiber Products.

67. To that end, CPI worked closely with Medline's implementation team to develop a dedicated i-mop® brochure and comprehensive sales plan, which included on site i-mop® demonstrations to Medline customers (end-users). CPI developed specialized i-mop® cases that could be used to ship i-mop® demo units all over the country via FedEx at highly competitive rates since Medline is among FedEx's largest customers (if not the largest customer).

68. In connection with Tennant's sales of i-mop® to the other CPI Legacy Customers, ISU was to receive a $450 royalty for each sale, payable from FCT/Global and Tennant ($225 each).

69. ISU was to focus primarily on the sale of i-range equipment (to be sourced from FCT/Global), and CPI Microfiber Products (to be purchased from CPI at an agreed mark-up for each Product). CPI, however, retained the exclusive right to sell CPI Microfiber Products directly

14

to certain select accounts, namely Hilliard Industries, commercial laundry accounts, school accounts and non-janitorial/sanitation accounts.

70.     Under the 2018 Agreement, ISU and CPI agreed to share employees (and associated costs).  Maurer was to manage both CPI and ISU, although his salary would be paid by CPI and his expenses paid by ISU.  Maurer was also to be entitled to a preferred $500,000 dividend (so long as there was sufficient revenue generated).

71.     In connection with i-invest's $1 million contribution to CPI that was earmarked towards the construction of the Innovation Center, ISU would become a co-tenant (with CPI) from which it would operate and share the monthly rent with (75% ISU, 25% CPI) under a 10-year lease.  CPI was expected to deliver the Center as a "turnkey building" for ISU, and to that end, CPI/i-Team procured more than $500,000 in furnishings for the office, display and training portions of the Center, and an additional $100,000 in storage racks and forklifts for the warehouse portion of the Center.  Global/i-invest provided $200,000 to ISU to procure furnishings that were used for the Center's kitchen.

72.     Per the 2018 Agreement, ISU's ongoing operations were to be funded by a credit facility through Rabobank, a Dutch lender chosen by Frank, and with which he was formerly an executive.  Global/i-invest was to provide marketing services and support to ISU for i-range equipment and CPI Microfiber Products.

73.     To build on the distribution network and goodwill developed by CPI (as a stand-alone company), ISU employees and agents touted their affiliation with CPI, and used CPI email addresses. Frank advised Maurer that he intended to eventually switch to an "@i-teamnorthamerica.com domain name for emails. ISU, CPI and Maurer supplied Global with reports, customer information, etc., necessary for such database integration, but Global did not create the necessary website or support to do so, despite repeated promises made by Frank to

Maurer during multiple meetings at Global's headquarters (although the change was belatedly made *after* Maurer's removal in 2023).

74.    Notwithstanding the terms and potential promise of the 2018 Agreement and associated assurances made in connection therewith, Global (and/or its affiliates) failed with respect to every essential element of the deal.

75.    First, ISU never received any royalties for sales of i-mop® to the CPI Legacy Accounts.  Tennant, which was not a party to the 2018 Agreement, refused to sell directly to the CPI Legacy Accounts, forcing these Accounts to instead purchase i-mops® from other distributors (to which Tennent already enjoyed exclusive sales rights) thereby benefiting from these indirect sales to the CPI Legacy accounts, but depriving ISU of its expected royalties.

76.    Moreover, the CPI Legacy Accounts that could no longer buy directly through ISU had substantially less incentive to purchase complementary or ancillary products from ISU, including CPI Microfiber Products and i-range equipment.  Thus, while ISU had budgeted $4 million in i-range sales to these CPI Legacy Accounts, the actual sales fell to approximately $100,000 (most of which was attributable to sales to Medline) after Tennant cut off direct sales to the CPI Legacy Accounts.

77.    With respect to CPI's i-mop® sales to Medline, the on-site demonstrations were extraordinarily well received, and demand among Medline's customers surged as planned.  But the sales by Medline did not follow because Tennant, apparently without any regard for what Frank assured Maurer were minimum price restrictions, systematically undercut Medline's pricing on i-mop® at every turn, causing Medline's sales, once projected to surge past 1000 units annually, to drop, eventually bottoming out at ten units per year.

78.    Maurer brought Tennant's refusal to sell directly to the CPI Legacy Accounts and its predatory pricing with respect to Medline customers to Frank's attention.  Frank acknowledged

16

that Tennant's failure to adhere to the terms of its deal with FCT/Global had prevented expected benefits under the 2018 Agreement from coming to fruition, but Frank only made empty promises to "look into it,"  and then brushed the concerns aside by suggesting that he was in the process of negotiating a new deal with Tennant in which the issue would be addressed.  In the meantime, however, the lack of royalty revenue constrained ISU's ability to operate.

79.     ISU's lack of operating cash was only exacerbated by Global/i-invest's failure to secure financing for ISU.  Although Frank claimed to be working with Rabobank to secure needed financing, nothing ever materialized for ISU.

80.     ISU was therefore forced to finance its operations using American Express credit cards issued to Maurer and other key personnel designated by Frank.

81.     All of those expenses were reflected in monthly profit and loss statements provided to Global and reviewed during monthly calls (actual credit card statements were also provided as requested) and recorded in ISU's QuickBooks ledger sent to Global and audited annually by an outside firm selected by Global. Neither Global, Frank nor anyone ever raised any contemporaneous challenge or objection to or about any of these charges, all of which were incurred on behalf of ISU.

82.     While Global would, from time to time, request top-line reductions to the annual budget due to the lack of i-range and i-mop® revenue, Global never stated or suggested that any category of expenses was excessive or inappropriate.  In fact, in meetings during which Mauer was present, Frank frequently praised Maurer to Marcel van Schaik ("Marcel"), Global's Finance Manager, for the fiscal discipline reflected in CPI's Profit & Loss Statement, stating repeatedly that CPI did not have to worry about Maurer expenses, as Maurer watched them closely and does not overspend.

83.    Eventually, Maurer approached Huntington Bank, the lender to Maurer and i-Team, and received a proposal for an approved credit facility at the prevailing market rates for ISU, subject only to execution of the loan documents. Frank flew into Michigan to meet with representatives of Huntington Bank, but ultimately refused to go forward with the loan, claiming that the market rates in the United States were substantially higher than those in the Netherlands. Frank advised Maurer that Global would instead fund ISU's operating cash needs.

84.    Ultimately, however, Frank reneged on that assurance, advising Maurer that i-invest would only finance half of ISU's cash needs (or $510,000) on the condition that CPI agreed to loan a proportionate amount ($490,000) to ISU.  CPI had little choice but to agree.  These initial loans were carried on the books as shareholder loans (but not otherwise contemporaneously documented).

85.    Despite the promises made in the 2018 Agreement, Global also failed to provide any meaningful marketing support to ISU.  Instead, Global devoted nearly all of its marketing resources to i-mop®, dedicating very little time or resources to the marketing of CPI Microfiber Products or i-range products.  As a result, demand for i-range equipment never materialized, and demand for CPI Microfiber Products, while consistent, did not grow to levels that could offset losses on i-range products.

86.    Maurer implored Frank to offer additional support, traveling to the Netherlands to meet with Global's marketing professionals to develop new marketing materials, but Frank ultimately refused to approve any of the marketing campaigns discussed with Global.

87.    Tennant's refusal to deal fairly with the CPI Legacy Accounts, and Frank's failure to insist on such fair dealings, coupled with the lack of marketing and financial support caused ISU to operate at a loss, obviating any preferred dividend payment to Maurer.

*The 2019 Heads of Agreement*

88.    In the fall of 2019, Frank advised Maurer that he made a new agreement with Tennant but again refused to provide a copy of the agreement, or any portion thereof, to Maurer.

89.    Per Frank, the new agreement with Tennant expanded its distribution rights into Canada and eliminated any obligation by Tennant to pay royalties on sales of i-mop® to any CPI Legacy Accounts, except for Medline.

90.    Frank acknowledged to Maurer that Global's support of ISU had been lacking, but pledged to change that, and pointed to the new agreement with Tennant as a turning point for cooperation between the various companies from which they would all benefit.

91.    Frank pledged to grow the i-range equipment market through a sustained marketing program overseen by dedicated marketing personnel, newly developed marketing materials and equipment focused sales managers.

92.    In connection therewith the parties entered into a new Heads of Agreement in October 2019 (the "2019 Agreement"), a copy of which is submitted herewith as **Exhibit D**.

93.    In connection with the 2019 Agreement, ISU was renamed and reorganized to become ITNA, and ITNA's business would be "split" such that CPI would only retain exclusive rights to sell CPI Microfiber Products to its commercial laundry, school customers and non-janitorial/sanitation customers, but cede those rights with respect to Hillyard to ITNA. ITNA would sell to other customers, including CPI Microfiber Products, which it would begin to purchase directly from CPI vendors.

94.    By contrast, under the 2019 Agreement, CPI was required to purchase CPI Microfiber Products from ITNA at a cost-plus formula, thereby improving ITNA's balance sheet while degrading CPI's balance sheet.

95.    All of the loans made by i-invest and CPI were carried forward on the same terms and conditions.  ITNA made interest only monthly payments to CPI on the outstanding loan balance.  The anticipated increased ITNA revenue from i-mop® and i-range would allow for a quick repayment of the loans beyond interest only. Also, ITNA would pay Maurer $50,000 for each $1M increase in sales (capped out at $300,000 annually, which was the amount CPI was paying for Maurer salary).

96.    In addition, to finance ITNA's purchase of CPI Microfiber Products, i-invest and CPI agreed to make ten-year loans (in proportion to their respective shareholder interest) totaling $1,406,867, at 6% interest to ITNA.  i-invest and CPI also agreed to make additional loans (on the same terms) to ITNA to satisfy certain payables due to CPI.

97.    ITNA continued to make interest only payments on the outstanding loan balance to CPI on a monthly basis.

98.    Per the 2019 Agreement, ITNA agreed to pay all of the rent due under the Innovation Center lease, although CPI would continue to have full use of the Center as a co-tenant under the lease.

99.    Frank, however, belatedly demanded changes to the design of the Innovation Center (despite having already approved the design as part of the 2018 Agreement and Maurer having completed construction of Center' interior) in order to make it look more like Global's building in the Netherlands, adding $1.2M to the original construction budget of $5,235,000 project cost as agreed upon and outlined in the prior Innovation Center lease agreement between ISU an CPI (signed by Frank and Maurer).  Frank also invoiced ITNA for reimbursement of the cost of having Dutch architects travel to Michigan and draw up designs for the reconfigured Center, which would require new building permits.

100.    Although Frank initially refused to pay the incremental cost of his eleventh-hour redesign, he ultimately acquiesced, and Maurer agreed to make the changes at Frank's expense (although, as set forth below, he ultimately reneged on that agreement). Frank's vanity changes ultimately delayed completion of construction by more than a year.

101.    To fulfill the marketing partnership contemplated by the 2019 Agreement and plans to grow i-range equipment sales, Maurer worked with Doug Kretchmer (who had a long tenured marketing relationship with Tennant), who also served as a liaison between Global and Tennant. Kretchmer used sales data provided to him by Tennant, Maurer, CPI and ITNA to identify the twenty-five customers that purchased *both* i-mops® from Tennant and CPI Microfiber Products from CPI/ITNA and worked with Maurer to develop a marketing plan to sell i-range equipment to those clients.

102.    Maurer and Kretchmer worked in tandem for several months to develop a 40-page color brochure that lauded the "i-partner" relationship between Tennant and ITNA, and to educate customers about the synergy to be gained by purchasing i-range equipment to accompany purchases of i-mops® (their batteries could be used interchangeably) and CPI Microfiber Products.

103.    Tennant reserved the right to approve the brochure and made substantive changes thereto, including inserting its logo onto various pages.  The final brochure went into circulation in January 2020, and Maurer, Kretchmer and Tennant representatives went on a barnstorming tour to visit the target customers (those that purchased both i-mops® and CPI Microfiber Products) to demonstrate and promote the i-range equipment.

104.    The objective, as Frank articulated, was to have Tennant promote i-range products to these and other customers.  That, however, never happened.

105.    In fact, after participating in the "i-partner" presentations, Tennant salespeople followed-up and actively undermined any interest in the i-range equipment and instead promoted Tennant equipment that competed with i-range equipment, such as Tennant vacuums.

106.    When Maurer learned from those target customers what Tennant was doing, he brought it to Frank's attention.  Rather than choosing to address this behavior, Frank quickly abandoned the "i-partnership" marketing strategy and instructed ITNA to return its inventory of i-range equipment.

107.    ITNA continued to provide extensive support for i-mop® products, including regular meetings with Doug Kretchmer and Tennant, providing necessary product support and warranty parts and services.

108.    Despite the valuable support that ITNA contributed, however, no revenues were shared with ITNA but rather were hoarded by Global and/or other entities that Frank controlled and in which Maurer had no interest.

109.    To make matters even more inequitable, despite receiving no upside on Tennant's i-mop® sales, Frank nevertheless allocated certain Global i-mop® related expenses (including $300,000 in freight, duty and/or forwarder charges, as well as machine updates) to ITNA.

110.    While ITNA's revenues remained stagnant, Maurer was overseeing the construction of the Innovation Center, as redesigned by Frank. Every month, when payment was due to contractors, Maurer requested that Frank pay a portion of the $1.2 million he promised to contribute to iTeam.  Frank, however, simply ignored the requests.

111.    In fact, despite promising to contribute $1.2 million to cover the incremental costs of his mandated redesign of the Center, Frank refused to contribute anything. iTeam and Maurer were forced to pay the $1.2 million out of their own funds.

112. Instead, Frank recommended to Maurer that iTeam sell and lease back the Innovation Center (which Frank explained Global had done with its buildings in Europe), to pay the balance of the construction loan and incremental expenses incurred at Frank's insistence.

113. Without any meaningful alternative, iTeam sold the property to an unaffiliated third-party as part of a pre-arranged sale-leaseback in which ITNA and CPI were expressly co-tenants pursuant to a 15-year lease signed by Frank and Maurer, with plans to execute a sublease agreement pursuant to which CPI and FCT were to pay ITNA a portion of the rent from the Sale and Lease Back lease signed by Frank and Maurer.

114. The redesign substantially delayed the opening of the Innovation Center (from its original scheduled date of December 2019) which finally opened to customers in 2021, with some restrictions due to COVID-19.

115. In August 2022, after reaching agreement on all essential terms, Maurer sent the CPI and FCT sublease agreements for the Innovation Center to Global, but Global did not return the signed agreements.

116. On information and belief, Frank had already begun planning to force Maurer out of ITNA.

117. At this point, ITNA's sales were almost exclusively generated by CPI Microfiber Products (with the balance generated by isolated sales of i-mops® to Medline and i-range equipment).  While steady, those sales remained stagnant due to the lack of financing or marketing support from Global.

118. Decreased sales, shrinking margins, and crushing overhead expenses that were part of the 2018 and 2019 Agreements caused operating losses for ITNA through 2021 and into 2022.

119. In May 2022, Maurer met with Frank in Amsterdam, and Frank advised that FCT/Global was signing yet another new agreement with Tennant, pursuant to which ITNA's

distribution rights relating to i-mop® would be marginally expanded to customers in certain markets such as hospitality, quick-serve restaurants and contractors which Tennant had not achieved material penetration.  Frank also promised that ITNA would get distribution rights with respect to new Global products, including an autonomous scrubber and sweeper (high revenue items with retail prices of more than $30,000 per unit).

120.    This new arrangement, however, proved worthless to ITNA, as the demand among the limited customers allocated to ITNA was marginal, and the touted new products were not made available to ITNA, at least not during Maurer's tenure.  By contrast, the new arrangement was a windfall for Tennant, as ITNA could no longer sell the i-mop® to Medline, which effectively eliminated Medline as a competitor, giving Tennant exclusive distribution rights for the entire market, and giving it unchecked control, including the power to raise prices.

121.    Given Frank's pattern of reneging or failing to deliver on his promises, Maurer expressed a preference for separating CPI from ITNA and returning its focus on selling its CPI Microfiber Products.  Frank supported the idea when it was raised and told Maurer that they would provide a term sheet for his consideration.

122.    The term sheet prepared, however, demanded the payment of $2.5 million to buy-back the customer list (that was sold to the Company for an arbitrarily inflated price of $1 million to induce CPI to cede i-mop® distribution rights to Tennant), and contained no consideration of or reimbursement for CPI's extensive investment in i-mop®, or the unjust taking of its exclusive i-mop® distribution rights.

123.    The term sheet also purported to excuse any obligation by ITNA to repay the outstanding loans by CPI/Maurer under the guise of allegedly improper expenses that Maurer incurred dating back as far back as 2018.

124.    After Maurer expressed his dissatisfaction with the demand, Frank directed Marcel to spearhead those discussions with Maurer.

125.    Over the course of months, Maurer and Marcel discussed an array of options for separating, including a complete redemption of CPI's stock in ITNA, as well as a partial separation where CPI and Global would each operate separately in different sections of the Holland, MI Innovation Center (while sharing certain common areas, like the training center), with CPI selling its CPI Microfiber Products and ITNA selling i-mop® (to select customers) and i-range products.

126.    Ultimately, however, these negotiations proved fruitless, as Marcel continued to insist that CPI reimburse Global for an array of expenses that it had incurred (even though they were incurred under the 2018 and 2019 Agreements, and benefited Global rather than CPI) and continued to ascribe a grossly inflated value to the CPI customer list.

127.    Notably, at no time during these negotiations was there ever any discussion about CPI surrendering or sharing the rights with respect to its CPI Microfiber Products.

128.    In a thinly veiled attempt to exert leverage over CPI during these negotiations, Global inexplicably refused to fund ITNA's continued purchase of inventory as otherwise agreed as part of the 2019 Agreement, causing lengthy back orders.  As such, for a six-month period, ITNA was unable to fill orders for CPI Microfiber Product placed by two of the largest CPI Legacy Accounts, Sarasota County Schools and West Michigan Shared Laundry (which had historically generated $300,000 in profits for CPI), causing those customers to cease purchases from CPI.

129.    On information and belief, Global acted purposefully to interfere with those sales so that they could be diverted to other entities in which neither CPI nor Maurer had any interest.

130.    After separation talks had stalled, Maurer met again with Frank in October 2022 in Eindhoven, at which time Frank pledged that ITNA would have a renewed focus on distributing new Global equipment, that Global would assign a liaison person, Peter, to work and improve

communications between the parties, and that Global or its affiliate would provide long awaited financing support so that ITNA could replenish its inventory.

131.    In reality, Peter never served as a liaison and offered no sales support whatsoever. If anything, Peter worked to strip away remaining resources from ITNA and spent most of his time belatedly and baselessly harassing Maurer about expenses that had already been approved multiple times and at multiple levels by Global. Maurer spent an inordinate amount of time explaining and providing additional back-up for the expenses.

132.    Moreover, the long-awaited financing that Frank again promised was structured so as to require Maurer to loan an additional $1.5 million to ITNA (from the sale and lease back of the Innovation Center), so that existing loans could be restructured and the balance of the construction loan for the Innovation Center could be repaid.

133.    Global and/or its affiliates began to circumvent the agreed distribution arrangement/agreement and instead began purchasing containers of CPI Microfiber Products (without CPI's knowledge or consent) from the manufacturer and storing those containers in one or more Global warehouses in Eindhoven, Netherlands.  Global's Eindhoven warehouse was not "bonded," so it had to pay double duties (for import from China-to-Netherlands, and then again for import from Netherlands-to-North America) on all the CPI Microfiber Products.

134.    Global passed these freight charges and duties onto ITNA, and without notice or discussion, imposed an 18% surcharge on top of the costs of freight and duty. When Maurer received an invoice to ITNA with the 18% surcharge, he vehemently protested. Frank claimed that Global's system would not permit it to ship products without at least *some* mark-up, so Maurer proposed a 3-4% surcharge, an amount that both Peter and Marcel agreed would be reasonable. Frank, however, declined to reverse or reduce the 18% surcharge, through which he simply caused Global to siphon off profits from ITNA.

135.    Maurer requested that he be reimbursed for at least his 49% share of the 18% surcharge skimmed from ITNA's profits, but Marcel refused, effectively ensuring that whatever profits ITNA generated would benefit Frank solely, rather than Maurer.

136.    Frank also pulled the plug on plans to have ITNA grow equipment sales and CPI Microfiber Products together, without any reason or logic for doing so. Ultimately, this is the point where the relationship between Maurer/CPI and Frank/Global irreparably fractured.

137.    In or about November 2023, Peter changed all the locks to the Holland, Michigan Innovation Center building without advanced notification to Maurer. In fact, Peter brought it to Maurer's attention in casual conversation at a trade show in Las Vegas but assured him that he would be given a copy of the new key.

138.    CPI continued to pay its portion of the rent for the Innovation Center until Peter finally told Maurer that he would not be given a key to the new locks on the Center, and that Maurer would only be permitted in the Center during business hours and would have to be always chaperoned by an ITNA employee.

139.    These unilaterally imposed restrictions and conditions both ignored CPI's express rights under lease signed by Frank and Maurer.  In short, these actions deprived CPI of the quiet enjoyment of his tenancy.  As such, CPI appropriately ceased paying rent.

140.    Without any warning or basis, in April 2023, Frank advised Maurer that he was removed as the Manager/Chief Executive of ITNA.  Frank also indicated that ITNA would be amenable to a redemption of Maurer's 49% shareholder interest in ITNA.

141.    Eventually, Maurer was permitted to enter the Innovation Center to remove CPI branded inventory.  Maurer was not, however, permitted to remove any CPI/iTeam furniture, racks, forklifts, files or personal property from the Center, and ITNA continues to exercise dominion and control over all remaining CPI/iTeam property at the Center.

142.    After CPI ceased paying rent, ITNA defaulted on the repayment obligations on its loans from Maurer by ceasing payment of monthly interest due to Maurer.  At the time of the default, the outstanding principal balance due on the loans was $1,397,018, and the monthly interest only payments were $6,985.09.

**Final Efforts to Unwind the CPI/Global Joint Venture**

143.    Despite the inequity of his removal without cause, Maurer nevertheless remained committed to the orderly transition of his responsibilities over the course of the several months of negotiations with Peter that followed. Maurer was not compensated for his time incurred in providing transitional services to ITNA.

144.    During the negotiations between Peter and Maurer, ITNA employees and representatives continued to tout their affiliation with CPI and continued to use their CPI email accounts to communicate with customers.

145.    During the negotiations, CPI also permitted ITNA to continue ordering CPI Microfiber Products manufactured using CPI molds and tooling, even though there was no compensation for Maurer in doing this after being removed from ITNA.

146.    While negotiations continued, various technology software licenses that had been maintained in the name of CPI (and used during Maurer's tenure as ISU/ITNA's manager/chief executive) were maintained in the name of CPI and were extended for the benefit of ITNA, which was slow to establish to procure its own licenses.

147.    As part of the negotiations, Maurer also met regularly in Michigan, with Peter, who Frank installed as the new chief executive of ITNA, and who reported directly to Frank.  Maurer was not compensated for his time or reimbursed for expenses incurred in attending these meetings (although Peter directly paid for Maurer's hotel and for dinner during one of the many visits).

148. During their negotiations, Maurer and Peter had constructive discussions and reached a tentative agreement by which CPI would effectively purchase control of its customer list back from ITNA, but Frank rejected all aspects of the proposed accord.

149. Following Maurer's termination, ITNA effectively ceased its work with outside sales representatives, and the customers that they served. One client (Hillyard) that had become a $2M customer of ITNA, called Maurer three months after his termination, and reported that it had not been contacted by anyone at ITNA.

150. Instead, Frank began to systematically shift business away from ITNA to other entities that he controlled (and in which Maurer had no interest), including in at least one instance, having a Global affiliate invoice and collect from an ITNA customer for sales actually made by ITNA.

151. ITNA continues to market and sell CPI Microfiber Products utilizing the trademarks and 4D Clean<sup>TM</sup> Technology (or derivatives thereof) promotional materials even after terminating Maurer from managing ITNA with no compensation to CPI for use of its intellectual property.

152. Despite Maurer having made clear to Defendants that they no longer had his permission to sell CPI Microfiber Products, Defendants began falsely representing to customers that CPI was out of business and falsely claimed to be the sole source for CPI Microfiber Products.

153. Chad and Peter, among others at ITNA, repeatedly falsely told customers and/or sales representatives that ITNA products are still from CPI, and the products remain the same as the customer have always purchased from CPI and ITNA.

154. In reality, ITNA sourced its own knock-off Microfiber Products that look like CPI Microfiber Products but are not the same quality as those previously sold by CPI.

155.    Compounding this deceptive conduct, ITNA, and specifically Peter, began making false statements to customers that Maurer "stole money" from ITNA, to dissuade them from dealing with Maurer or CPI.

156.    In an effort to hire away the independent sales representatives that CPI hired and trained (as Frank demanded) to sell CPI Microfiber Products for ITNA, ITNA offered to give the representatives access to new high-revenue Global products, that had been promised to ITNA but never provided during Maurer's tenure with the Company.  Moreover, ITNA demanded that representatives terminate any relationship with CPI, eliminating CPI's ability to benefit from or recoup the time and resources invested in training those representatives.

157.    On information and belief, i-mop® annual sales exceed $20 million, although neither ITNA nor CPI has received any share of the profit or benefits from these sales.

## COUNT I

**(CPI Versus ITNA and ITP for Direct Infringement of the '412 Patent – 35 U.S.C. § 271)**

158.    CPI repeats and realleges the allegations of paragraphs 1 through 157 above as though fully set forth herein.

159.    United States Patent No. 9,713,412 for Cleaning System Patent (the "Cleaning System Patent") is valid and enforceable, having been duly issued by the United States Patent and Trademark Office, and is unexpired.  The Cleaning System Patent is wholly owned by CPI.

160.    The Cleaning System Patent generally relates to a novel device, namely a mesh back mop head that includes a cleaning surface and mesh backing member.

161.    The Cleaning System Patent is comprised of the following eight (8) claims:

1. A mop head comprising: a cleaning surface; a backing member, the cleaning surface secured to the backing member along a plurality of lines to define channels in the cleaning surface, the backing member being formed from an open mesh material that substantially allows the free flow of liquid therethrough, the open mesh being formed from a polymeric

coated fiber material and being substantially liquid impermeable; and at least one receiver operably mounted to the backing member for receiving a mop head frame.

2. The mop head of claim 1, including two receivers, spaced from and opposing one another affixed to the backing member opposite the cleaning surface.

3. The mop head of claim 2 wherein the receivers are formed as pockets.

4. The mop head of claim 2 wherein the receivers are formed from the open mesh material.

5. A cleaning system comprising: a mesh back mop head having a cleaning surface, a backing member, and at least one receiver operably mounted to the backing member for receiving a mop head frame, wherein the cleaning surface is secured to the backing member along a plurality of lines to define channels in the cleaning surface and wherein the backing member is formed from an open mesh material that substantially allows the free flow of liquid therethrough, the open mesh being formed from a polymeric coated fiber material and being substantially liquid impermeable; a mop head frame having at least one cooperating securing member for removably securing the mop head thereto; a handle operably connected to the mop head frame; and a container configured to receive a plurality of mesh back mop heads.

6. The cleaning system of claim 5 wherein the mop head frame includes a connector for releasably connecting a handle thereto.

7. The cleaning system of claim 6 including a swivel base operably connected to the connector, the swivel base having a two-axis gimbal joint to permit rotation of the rotation of the handle in at least two directions relative to the mop head frame.

*See* Ex. A at pp. 5-6.

162.    CPI distributes its CPI Microfiber Products containing the Cleaning System Patent in interstate commerce, ships its products to customers throughout the United States through instrumentalities of interstate commerce, and solicits orders and payments in connection with those sales through instrumentalities of interstate commerce.

163.    On April 10, 2024, counsel for CPI sent a formal written notice to counsel for ITNA and ITP, advising them, as well as their affiliates, principals, agents and representatives (including Tennant), that they had no permission and to cease and desist their ongoing sales of any CPI Microfiber Products.

164.    Despite this termination letter and notice, ITNA and ITP continue to make, use, offer for sale, sell, and/or import into the United States CPI Microfiber Products that infringe on one or more claims of the Cleaning System Patent, without Plaintiff's authorization.  A detailed breakdown of each claim related to the Cleaning System Patent, with appropriate photographic depictions of the infringing products and annotations regarding the infringed claims is submitted herewith as **Exhibit E**.

165.    ITNA's and ITP's continued sale and distribution of CPI Microfiber Products that incorporate one or more claims of the Cleaning System Patent, constitutes direct infringement under 35 U.S.C. § 271(a).

166.    ITNA's and ITP's actions have been and remain knowing, willful, and in disregard of CPI's exclusive patent rights. ITNA's and ITP's continued infringement following the termination of its distribution rights demonstrates intentional and egregious misconduct.

167.    As a direct and proximate result of ITNA's and ITP's unauthorized and willful infringement, CPI has suffered, and continues to suffer, irreparable harm, including lost sales, market share, and injury to business reputation and goodwill.

168.    CPI has no adequate remedy at law and is entitled to injunctive relief pursuant to 35 U.S.C. § 283, as well as monetary damages adequate to compensate for the infringement, including treble damages for willfulness pursuant to 35 U.S.C. § 284.

**WHEREFORE**, CPI respectfully requests that the Court enter judgment in its favor and against ITNA and ITP, jointly and severally, to Count I and award the following relief: (a) preliminary and permanent injunction under 35 U.S.C. § 283 enjoining ITNA and ITP, as well as all entities and persons acting in concert with it from making, using, selling, offering for sale, or importing any products that infringe the Cleaning System Patent; (b) an award of damages adequate to compensate CPI for the referenced infringement, but in no event less than a reasonable

royalty, together with pre-judgment and post-judgment interest; (c) an award of enhanced damages under 35 U.S.C. § 284 due to the willful nature of the infringement; (d) an award of attorneys' fees and costs pursuant to 35 U.S.C. § 285; and (e) such additional relief as the Court deems just and proper.

## COUNT II

### (CPI Versus Frank for Induced Infringement of the '412 Patent – 35 U.S.C. § 271(b))

169.    CPI repeats and realleges the allegations of paragraphs 1 through 168 above as though fully set forth herein.

170.    As set forth above, Frank actively controls and directs all aspects of ITNA and ITP's business and has caused and induced and continue to cause and induce the infringement of the Cleaning System Patent described above.

171.    Frank has actual knowledge of the Cleaning System Patent described above and expressly intended that ITNA and ITP infringe on the Patent, thereby making his actions of inducement knowing, willful, and in disregard of CPI's exclusive patent rights.

172.    As a direct and proximate result of the unauthorized and willful infringement that Frank has induced, CPI has suffered, and continues to suffer irreparable harm, including lost sales, market share, and injury to business reputation and goodwill.

173.    CPI has no adequate remedy at law and is entitled to injunctive relief pursuant to 35 U.S.C. § 283, as well as monetary damages adequate to compensate for the infringement, including treble damages for willfulness pursuant to 35 U.S.C. § 284.

**WHEREFORE**, CPI respectfully requests that the Court enter judgment in its favor and against Frank as to Count II and award the following relief: (a) preliminary and permanent injunction under 35 U.S.C. § 283 enjoining Frank, as well as all entities and persons acting in concert with him from directing, assisting or otherwise inducing the making, using, selling,

offering for sale, or importing any products that infringe the Cleaning System Patent; (b) an award of damages adequate to compensate CPI for the referenced infringement, but in no event less than a reasonable royalty, together with pre-judgment and post-judgment interest; (c) an award of enhanced damages under 35 U.S.C. § 284 due to the willful nature of the induced infringement; (d) an award of attorneys' fees and costs pursuant to 35 U.S.C. § 285; and (e) such additional relief as the Court deems just and proper.

## COUNT III

**(CPI Versus ITNA and ITP for Direct Infringement of the '725 Patent – 35 U.S.C. § 271)**

174.   CPI repeats and realleges the allegations of paragraphs 1 through 173 above as though fully set forth herein.

175.   United States Patent No. 9,957,725 for CPI's Multi-Purpose Cleaning Trowel (the "Multi-Purpose Cleaning Trowel Patent") is valid and enforceable, having been duly issued by the United States Patent and Trademark Office, and is unexpired. The Multi-Purpose Cleaning Trowel Patent is wholly owned by CPI.

176.   The Multi-Purpose Cleaning Trowel Patent generally relates to a novel device, namely a multipurpose cleaning trowel, that includes a flexible section and blade section, as well as a handle device.

177.   The Multi-Purpose Cleaning Trowel Patent is comprised of the following sixteen (16) claims:

1. A cleaning trowel, comprising: a generally planar base having a first side and a second side, a flexible section extending from a first end of the base, a blade section extending from a second end of the base opposite the first end of the base, and a mounting section positioned between the flexible section and the blade section, the flexible section and the blade section being formed from different materials than each other, wherein the flexible section includes a plurality of generally linear grooves forming areas of reduced thickness to allow for flexing, the generally flexible section between the grooves having a generally uniform thickness, and wherein the blade section has a proximate end and a distal end and decreases in

thickness from the proximate end to the distal end; a handling device on the first side of the base at the mounting section, the handling device being a fixed handle and including a handle base and a gripping portion, wherein the handle base is removably secured to and in contact with the mounting section, and the gripping portion extends from the handle base at an angle such that the gripping portion is spaced from the base, the fixed handle housing a power source; and a cleaning pad receiving region on the base.

2. The cleaning trowel of claim 1, wherein the flexible section is made from a different material than other portions of the base.

3. The cleaning trowel of claim 1, wherein the flexible section is a different color than other portions of the base.

4. The cleaning trowel of claim 1, wherein the blade section is made from the same material as the mounting section and is integrally formed as a one- piece construction with the mounting section.

5. The cleaning trowel of claim 1, wherein the mounting section includes at least one fastening hole configured to receive a fastener to removably secure the handling device to the mounting section.

6. The cleaning trowel of claim 5, wherein the at least one fastening hole extends through the base from the first side to the second side.

7. The cleaning trowel of claim 1, wherein the power source is at least one battery.

8. The cleaning trowel of claim 1, wherein the fixed handle further includes at least one light operably connected to the power source.

9. The cleaning trowel of claim 8, wherein the at least one light includes at least one white light and at least one ultraviolet light.

10. The cleaning trowel of claim 8, wherein the fixed handle further comprises a switch to operate the at least one light.

11. The cleaning trowel of claim 1, wherein the handling device is a swivel base, wherein the swivel base is configured to connect to an elongated handle member.

12. The cleaning trowel of claim 11, wherein the swivel base is rotatable about two axes.

13. The cleaning trowel of claim 1, wherein the handling device is removably secured to the mounting section, and including a swivel base, wherein the swivel base is configured to rotate about two axes and is configured to have an elongated member connected thereto.

14. The cleaning trowel of claim 1 including a cleaning pad mounted to the cleaning pad receiving region.

15. A cleaning trowel, comprising: a generally planar base having a first side and a second side, a flexible section extending from a first end of the base, a blade section extending from a second end of the base opposite the first end of the base, and a mounting section positioned between the flexible section and the blade section, the flexible section and the blade section being formed from different materials than each other, wherein the flexible section includes a plurality of generally linear grooves forming areas of reduced thickness to allow for flexing, the generally flexible section between the grooves having a generally uniform thickness, and wherein the blade section has a proximate end and a distal end and decreases in thickness from the proximate end to the distal end; a handling device on the first side of the base at the mounting section; and a cleaning pad, the cleaning pad including a cleaning side configured to engage a surface to be cleaned and an attachment side configured to be attached to the base, the attachment side facing the first side of the base and including a first attachment loop configured to receive the flexible section of the base and a second attachment loop configured to receive the blade section of the base, thereby removably securing the cleaning pad to the base.

16. The cleaning trowel of claim 15, wherein the cleaning side includes a plurality of microfiber loops configured to clean a surface.

*See* Ex. B at p. 13.

178.    CPI distributes its CPI Microfiber Products containing the Multi-Purpose Cleaning Trowel Patent in interstate commerce, ships its products to customers throughout the United States through instrumentalities of interstate commerce, and solicits orders and payments in connection with those sales through instrumentalities of interstate commerce.

179.    On April 10, 2024, counsel for CPI sent a formal written notice to ITNA and ITP (through their counsel), advising them, as well as its affiliates, principals, agents and representatives (including Tennant), to cease and deist ongoing sales of any CPI Microfiber Products.

180.    Despite this termination, ITNA and ITP continue to make, use, offer for sale, sell, and/or import into the United States CPI Microfiber Products that infringe on one or more claims of the Multi-Purpose Cleaning Trowel Patent, without Plaintiff's authorization.   A detailed breakdown of each claim related to the Multi-Purpose Cleaning Trowel Patent, with appropriate photographic depictions of the infringing products and annotations regarding the infringed claims is submitted herewith as **Exhibit F**.

181.    ITNA's and ITP's continued sale and distribution of CPI Microfiber Products containing the Multi-Purpose Cleaning Trowel Patent constitutes direct infringement under 35 U.S.C. § 271(a).

182.    ITNA's and ITP's actions have been and are knowing, willful, and in disregard of CPI''s exclusive patent rights. ITNA's and ITP's continued infringement following the termination of its distribution rights demonstrates intentional and egregious misconduct.

183.    As a direct and proximate result of ITNA's and ITP's unauthorized and willful infringement, CPI has suffered, and continues to suffer, irreparable harm, including lost sales, market share, and injury to business reputation and goodwill.

184.    CPI has no adequate remedy at law and is entitled to injunctive relief pursuant to 35 U.S.C. § 283, as well as monetary damages adequate to compensate for the infringement, including treble damages for willfulness pursuant to 35 U.S.C. § 284.

**WHEREFORE**, CPI respectfully requests that the Court enter judgment in its favor and against ITNA and ITP, jointly and severally, as to Count III and award the following relief: (a) preliminary and permanent injunction under 35 U.S.C. § 283 enjoining ITNA and ITP, as well as all entities and persons acting in concert with it from making, using, selling, offering for sale, or importing any products that infringe the Multi-Purpose Cleaning Trowel Patent; (b) an award of damages adequate to compensate CPI for the referenced infringement, but in no event less than a reasonable royalty, together with pre-judgment and post-judgment interest; (c) an award of enhanced damages under 35 U.S.C. § 284 due to the willful nature of the infringement; (d) an award of attorneys' fees and costs pursuant to 35 U.S.C. § 285; and (e) such additional relief as the Court deems just and proper.

## <u>COUNT IV</u>

**(CPI Versus Frank for Induced Infringement of the '725 Patent – 35 U.S.C. § 271(b))**

185.    CPI repeats and realleges the allegations of paragraphs 1 through 184 above as though fully set forth herein.

186.    As set forth above, Frank actively controls and directs all aspects of ITNA and ITP's business and has caused and induced and continue to cause and induce the infringement of the Multi-Purpose Cleaning Trowel Patent described above.

187.    Frank has actual knowledge of the Multi-Purpose Cleaning Trowel Patent described above and expressly intended that ITNA and ITP infringe on the Patents, thereby making their actions in inducing the infringement knowing, willful, and in disregard of CPI''s exclusive patent rights.

188.    As a direct and proximate result of the unauthorized and willful infringement that Frank has induced, CPI has suffered, and continues to suffer irreparable harm, including lost sales, market share, and injury to business reputation and goodwill.

189.    CPI has no adequate remedy at law and is entitled to injunctive relief pursuant to 35 U.S.C. § 283, as well as monetary damages adequate to compensate for the infringement, including treble damages for willfulness pursuant to 35 U.S.C. § 284.

**WHEREFORE**, CPI respectfully requests that the Court enter judgment in its favor and against Frank as to Count IV and award the following relief: (a) preliminary and permanent injunction under 35 U.S.C. § 283 enjoining Frank as well as all entities and persons acting in concert with him from directing, assisting or otherwise inducing the making, using, selling, offering for sale, or importing any products that infringe the Multi-Purpose Cleaning Trowel Patent; (b) an award of damages adequate to compensate CPI for the referenced infringement, but in no event less than a reasonable royalty, together with pre-judgment and post-judgment interest; (c) an award of enhanced damages under 35 U.S.C. § 284 due to the willful nature of the induced

infringement; (d) an award of attorneys' fees and costs pursuant to 35 U.S.C. § 285; and (e) such additional relief as the Court deems just and proper.

## COUNT V

### (CPI Versus ITNA, ITP and Frank for Injunctive Relief
### Under the Lanham Act – 15 U.S.C. § 1125(a))

190.    CPI repeats and realleges the allegations of paragraphs 1 through 190 above as though fully set forth herein.

191.    CPI is the lawful owner of one or more federally registered trademarks,  including but not limited to U.S. Trademark Registration Nos. 5,314,731 for the mark ECART for use in connection with portable trolleys for the storage of cleaning materials and cleaning equipment, 5,617,905 for the mark I-CART for use in connection with portable trolley for the storage of cleaning materials and cleaning equipment, 5,449,170 for the mark E SERIES for use in connection with cleaning materials and equipment, namely, portable trolleys for the storage of cleaning materials and cleaning equipment, buckets, cleaning cloths, frames for cleaning mops, cleaning heads for cleaning mops, hand-held scrapers for cleaning and cleaning pads therefor, 5,151,215 for the mark EDOUBLE for use in connection with cleaning materials, namely, cleaning cloths, cleaning dusters and cleaning mops made from synthetic materials, 5,151,216 for the mark EWAVE for use in connection with cleaning materials, namely, cleaning cloths, cleaning dusters and cleaning mops, all made from synthetic materials, and 5,151,213 for the mark ETROWEL for use in connection with hand-held cleaning device, namely, a hand-held duster and scraper and cleaning pads for use with the hand-held duster and scraper, 5,449,170 for the mark IFIBER for use in connection with cleaning materials, namely, cleaning cloths, cleaning dusters, cleaning mops and cleaning trowel pads, all made from synthetic materials, and 016280745 for the mark ISCRUB for use in connection with cleaning machines, cleaning pads for machines and trowels

(collectively, the "CPI Marks"), which are valid, subsisting, and in full force and effect, copies of which United States registration certificates are attached hereto as **Group Exhibit G**.

192.    CPI uses the CPI Marks in commerce in connection with the manufacture, marketing, and sale of  its CPI Microfiber Products, and has invested substantial resources in developing and maintaining the quality, goodwill, and consumer recognition associated with these products.

193.    ITNA and ITP, without authorization or consent from CPI, have imported, marketed, offered for sale, and/or sold products bearing the CPI Marks without the right or authority to do so.  A breakdown of CPI Marks, with appropriate photographic depictions of some of the infringing products is submitted herewith as **<u>Exhibit H</u>**.

194.    The microfiber products that ITNA and ITP have marketed and sold closely resemble but actually differ materially from the CPI Microfiber Products in one or more respects, including the absence or inapplicability of warranty or customer support services and/or the lack of adherence to CPI's standards for quality control.

195.    Use of the CPI Marks by ITNA and ITP in connection with products that resemble the CPI Microfiber Products is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of ITNA and/or ITP with CPI, or as to the origin, sponsorship, or approval of the ITNA and/or ITP products by CPI.

196.    The unauthorized sale of these infringing microfiber products constitutes a false designation of origin and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as such goods are likely to cause confusion or mistake, or to deceive consumers as to their characteristics, origin, sponsorship, and/or approval by Plaintiffs.

197.    Through its conduct, ITNA and ITP are causing, and will continue to cause, irreparable harm to CPI, including but not limited to damage to CPI's reputation, loss of consumer

goodwill, erosion of brand integrity, and interference with CPI's ability to control the quality of goods bearing the CPI Marks.

198.   CPI has no adequate remedy at law. Unless ITNA and ITP are enjoined from selling and distributing products utilizing the CPI Marks, CPI will suffer continued and irreparable harm.

199.   CPI  is therefore entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116 to prevent further acts of false designation of origin and unfair competition.

**WHEREFORE,** CPI respectfully requests that the Court enter judgment in its favor and against ITNA and ITP as to Count V, and award the following relief:  (a) preliminary and permanent injunction enjoining ITNA and ITP, their corporate parents, subsidiaries and affiliates, and their respective agents, officers, servants, employees, and all persons in active concert or participation with them, from importing, distributing, advertising, marketing, offering for sale, or selling any goods bearing CPI Marks; (b) an order requiring Defendants to surrender for destruction all Microfiber Products, packaging, promotional materials, and other items bearing CPI Marks that are in any Defendants' possession or control; (c). an award equal to CPI's attorneys' fees and costs pursuant to 15 U.S.C. § 1117(d); and such additional relief as the Court may deem just and proper.

## <u>COUNT VI</u>

**(CPI Versus ITNA, ITP and Frank for Damages for Trademark Infringement in violation of the Lanham Act – 15 U.S.C. § 1125(a))**

200.   CPI repeats and realleges the allegations of paragraphs 1 through 199 above as though fully set forth herein.

201.   As described above, the unlawful sales by ITNA and ITP of microfiber products using the CPI Marks is likely to mislead and deceive consumers as to the origin, sponsorship, and

approval of the goods, thereby constituting a false designation of characteristics, origin and/or false or misleading representation in violation of 15 U.S.C. § 1125(a).

202.    Frank actively controls and directs all aspects of ITNA and ITP's business and has caused and directed and continue to cause and direct the infringement of the CPI Marks.

203.    ITNA's, ITP's and Frank's conduct is likely to cause confusion, mistake or deception as to the affiliation, connection, or association of Defendants with CPI, or as to the origin, sponsorship, or approval of Defendant's goods by CPI.

204.    ITNA's, ITP's and Frank's actions have been and remain willful, knowing, and deliberate, and are intended to trade on CPI's goodwill and reputation.

**WHEREFORE**, CPI respectfully requests that this Court enter judgment in its favor and against ITNA, ITP and Frank, jointly and severally, as to Count VI and grant the following relief: (a) an award of the Defendants' profits and CPI's actual damages, in an amount to be determined at trial; (b); treble damages under 15 U.S.C. § 1117(a) for willful infringement; (c) an award of reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1117(a); and (d) such other and further relief as the Court may deem just and proper.

## <u>COUNT VII</u>

### (CPI Versus all Defendants for Common Law Trademark Infringement)

205.    CPI repeats and realleges the allegations of paragraphs 1 through 204 above as though fully set forth herein.

206.    Although not registered, the term 4D Clean[TM] Technology was developed by CPI and was the first to use the term in commerce throughout the United States in connection with its promotion and sale of its CPI Microfiber Products.

207.    4D Clean[TM] Technology is distinctive and associated in the marketplace with CPI Microfiber Products.

208.    4D Clean™ Technology is a valid and legally protectable trademark.

209.    ITNA, ITP and Frank, on information and belief, all of the Defendants have used and are using the 4D Clean™ Technology trademark without permission or authority to market and sell microfiber products that bear the CPI Marks.

210.    The Defendants' unauthorized use of the 4D Clean™ Technology trademark has created a likelihood of confusion as to the characteristics, source and affiliation as to the microfiber products marketed and sold by Defendants.

211.    In addition to their infringing sales, Defendants' conduct is causing, and will continue to cause, irreparable harm to CPI, including but not limited to damage to CPI's reputation, loss of consumer goodwill, erosion of brand integrity, and interference with CPI's ability to control the quality of goods bearing the CPI Marks.

212.    CPI has no adequate remedy at law. Unless Defendants are enjoined from further sales and distribution of microfiber products utilizing the 4D Clean™ Technology trademark, CPI will suffer continued and irreparable harm.

213.    CPI  is therefore entitled to preliminary and permanent injunctive relief.

**WHEREFORE,** CPI respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally as to Count VII, and award the following relief:  (a) preliminary and permanent injunction enjoining Defendants, their corporate parents, subsidiaries and affiliates, and their respective agents, officers, servants, employees, and all persons in active concert or participation with them, from importing, distributing, advertising, marketing, offering for sale, or selling any goods using the 4D Clean™ Technology trademark; (b) an order requiring Defendants to surrender for destruction all Microfiber Products, packaging, promotional materials, and other items bearing the 4D Clean™ Technology trademark that are in any Defendants'

possession or control; (c) award damages for infringing sales made to date utilizing the 4D Clean™ technology Trademark; and such additional relief as the Court may deem just and proper.

## COUNT VIII

### (CPI Versus all Defendants for Damages for Unfair Competition)

214.    CPI repeats and realleges the allegations of paragraphs 1 through 213 above as though fully set forth herein.

215.    As set forth above, the representations by all Defendants that suggest that they have succeeded CPI, coupled with their unauthorized use of the CPI Marks and its 4D Clean™ Technology trademark, and their locking CPI out of the Holland, MI Innovation Center were designed to deceive and have deceived the public into believing that the microfiber products that ITNA and ITP are selling are CPI Microfiber Products.

216.    By doing so, Defendants are trading on the reputation and valuable goodwill developed by CPI, to sell a knock-off and inferior products.

217.    As a direct and proximate result, CPI has suffered economic injury, namely lost sales and injury to its goodwill.

**WHEREFORE,** CPI respectfully requests that the Court enter judgment in its favor and against all Defendants as to Count VIII, and award damages in an amount to be determined at trial, and such additional relief as the Court may deem just and proper.

## COUNT IX

### (CPI Versus ITNA, Global and Frank for Shareholder Oppression in Violation of MCR 450.1489)

218.    CPI repeats and realleges the allegations of paragraphs 1 through 217 above as though fully set forth herein

219.    The shares of ITNA are not listed on a securities exchange or regularly traded in any market.

220.    The relationship among shareholders in a closely held corporation requires a higher standard of fiduciary responsibility, akin to a partnership.

221.    Without regard to heightened fiduciary standard, and as set forth above, Global and Frank used their control over ITNA to systematically and continuously exploit CPI and to funnel opportunities from which all shareholders should have benefited to other affiliates of Global at the expense of ITNA.

222.    The actions taken by Global and Frank have been fraudulent, willfully unfair and oppressive towards CPI.

223.    The Court should order the purchase or redemption of CPI's shareholder interest in ITNA at its fair value pursuant to MCR 450.1489(1)(e), taking into account and effectively excluding the adverse impact of the unfair and oppressive conduct on the value of ITNA.

**WHEREFORE**, CPI respectfully requests that this Court enter judgment in its favor and against Defendants ITNA, Global and Frank, jointly and severally, as to Count IX and grant the following relief: (a) ordering the Defendants to purchase at fair value CPI's shareholder interest in ITNA in an amount to be determined at trial; (b); an award of damages caused to the value of CPI's shareholder interest in ITNA; (c) interest on the purchase price from the commencement of this Action to the date of the purchase; (d) an award of reasonable attorneys' fees and costs; and (e) such other and further relief as the Court may deem just and proper.

## COUNT X

### (Maurer Versus ITNA for Defamation *Per Se*)

224.    Maurer repeats and realleges the allegations of paragraphs 1 through 223 above as though fully set forth herein

225.    As set forth above, ITNA (through Peter and others) has told and continues to tell ITNA customers that Maurer "stole money" from ITNA.

226.    These statements are unequivocally false.

227.    ITNA made and continues to repeat the false statement with actual knowledge of its falsity, to dissuade former CPI customers from dealing with CPI.

228.    ITNA's statements are defamatory *per se,* causing reputational harm to Maurer.

229.    ITNA made and makes these false statements willfully, purposefully and with malice, with the intention of causing injury to Maurer, thereby justifying an award of punitive damages to deter from such tortious conduct in the future.

**WHEREFORE,** Maurer respectfully requests that this Court enter judgment in his favor and against ITNA s to Count X and award the following relief: (a) an award of damages in an amount to be determined at trial; (b) an additional amount at least equal thereto as punitive damages, and (c) such other and further relief as the Court may deem just and proper.

## COUNT XI

### (Maurer Versus ITNA for Breach of Loan Agreement)

230.    Maurer repeats and realleges the allegations of paragraphs 1 through 229 above as though fully set forth herein.

231.    As set forth above, the principal unpaid balance of Maurer's loans to ITNA is $1,397,018.

232.    ITNA defaulted on the loan agreement by failing to pay interest in March 2024, or for any month thereafter.  As a result of ITNA's default, Maurer has been damaged.

**WHEREFORE,** Maurer respectfully requests that this Court enter judgment in his favor and against ITNA as to Count XI and award the following relief: (a) an award of damages in the amount of $1,397,018, plus 6% interest dating back to March, 2024 that should continue to accrue

until the loan is paid in full; and (b) such other and further relief as the Court may deem just and proper.

**COUNT XII**

**(Plaintiffs Versus ITNA, Global and i-Invest for Breach of the 2018 Agreement)**

233.    Maurer and CPI repeat and reallege the allegations of paragraphs 1 through 232 above as though fully set forth herein.

234.    The 2018 Agreement was and is a valid and enforceable contract.

235.    Maurer and CPI performed their respective obligations under the 2018 Agreement.

236.    As described more fully above, ITNA, Global and i-invest breached their obligations under the 2018 Agreement, including the covenant of good faith and fair dealing implied at law therein.

237.    As a direct and proximate result of their breach of the 2018 Agreement, Maurer and CPI have been injured.

**WHEREFORE,** Maurer and CPI respectfully request that this Court enter judgment in their favor and against ITNA, Global and i-invest as to Count XII and award the following relief: (a) an award of damages in an amount to be determined at trial; and (b) such other and further relief as the Court may deem just and proper.

**COUNT XIII**

**(Plaintiffs Versus ITVA, Global and i-Invest for Breach of the 2019 Agreement)**

238.    Maurer and CPI repeat and reallege the allegations of paragraphs 1 through 237 above as though fully set forth herein.

239.    The 2019 Agreement was and is a valid and enforceable contract.

240.    Maurer and CPI performed their respective obligations under the 2019 Agreement.

241.    As described more fully above, ITNA, Global and i-invest breached their obligations under the 2019 Agreement, including the covenant of good faith and fair dealing implied at law therein.

242.    As a direct and proximate result of their breach of the 2019 Agreement, Maurer and CPI have been injured.

**WHEREFORE,** Maurer and CPI respectfully request that this Court enter judgment in their favor and against ITNA, Global and i-invest as to Count XIII and award the following relief: (a) an award of damages in an amount to be determined at trial; and (b) such other and further relief as the Court may deem just and proper.

## COUNT XIV

### (By CPI Versus ITNA for Conversion in violation of MCL 600.2919a)

243.    CPI repeats and realleges the allegations of paragraphs 1 through 242 above as though fully set forth herein.

244.    As set forth above, ITNA has wrongfully exercised dominion and control over all the CPI property that remains in the Innovation Center, including furnishings, racks and certain equipment.

245.    ITNA has denied CPI access or use of its property, which ITNA has converted for its own use.

246.    As a direct and proximate result of ITNA's conduct, CPI has been damaged.

**WHEREFORE,** CPI respectfully requests that this Court enter judgment in his favor and against ITNA as to Count XVIII and award the following relief: (a) an award of damages equal to three times (3x) the actual value of the property converted, (b) awarding CPI its attorneys' fees and costs, and (c) such other and further relief as the Court may deem just and proper.

## COUNT XV

**(By Maurer Against all Defendants for Affirmative Injunctive Relief to Allow
Access to Innovation Center to Remove Personal Property)**

247.    Maurer repeats and realleges the allegations of paragraphs 1 through 246 above as though fully set forth herein.

248.    In addition to having exercised dominion and control over all the CPI furnishings, racks and certain equipment that remain in the Innovation Center, Defendants have refused to grant Maurer access to the Center (including his office) so that he can remove his personal effects that were left behind when he was locked out.

249.    Despite repeated requests, Defendants continue to refuse to deny Maurer access to Innovation Center for the limited purpose of removing his personal effects.

250.    Defendants have no legitimate right or basis to deny Maurer access to Innovation Center for the limited purpose of removing his personal effects.

251.    There is no adequate remedy at law for the loss of personal effects which have sentimental value to Maurer and cannot be replaced.

252.    There is no credible harm to any of the Defendants in permitting Maurer to access the Innovation Center for the limited purpose of removing his personal effects.

**WHEREFORE,** Maurer respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, as to Count XV, granting him an affirmative injunction requiring Defendants to grant Maurer reasonable access the Innovation Center for the limited purpose of removing his personal effects, and such additional relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs request a trial by jury with respect to all counts for which they are entitled to a jury.

Respectfully submitted,

**CREATIVE PRODUCTS INTERNATIONAL, ITEAM, LLC, and DAVE MAURER, Plaintiffs**

By: _/s/ Justin P. Bagdady_
Justin P. Bagdady (P79764)
Sinead G. Redmond (P85718)
201 S. Division St., Suite 400
Ann Arbor, Michigan 48104
(734) 761-3780
jbagdady@bodmanlaw.com
sredmond@bodmanlaw.com

Of Counsel:

George J. Spathis
Jason B. Hirsh
Ashley J. Roeser
LEVENFELD PEARLSTEIN, LLC
120 South Riverside Plaza, Suite 1800
Chicago, Illinois 60606
312.346.8380
gspathis@lplegal.com