UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CREATIVE PRODUCTS
INTERNATIONAL, INC., et al.,

Plaintiffs,

v.

I-TEAM NORTH AMERICA, INC., et al.,

Defendants.
_____________________________________/

Case No. 1:26-cv-823

Hon. Hala Y. Jarbou

**OPINION**

Plaintiffs Creative Products International, Inc.; iTeam, LLC; and Dave Maurer bring this patent and trademark infringement lawsuit against Defendants i-team North America, Inc.; i-team Global B.V.; i-invest B.V.; i-team professional, B.V.; Future Cleaning Technologies, B.V.; Frank van de Ven; Peter de Roo; and Chad Harmsen. Plaintiffs assert claims for patent infringement (Counts I and III), induced patent infringement (Counts II and IV), trademark infringement under the Lanham Act (Counts V and VI), common-law trademark infringement (Count VII), unfair competition (Count VIII), shareholder oppression in violation of Mich. Comp. Laws § 450.1489 (Count IX), defamation (Count X), breach of contract (Counts XI, XII, and XIII), conversion in violation of Mich. Comp. Laws § 600.2919a (Count XIV), and replevin (Count XV).[1] Before the Court is Defendants' motion to dismiss Plaintiffs' complaint for failure to state a claim (ECF No. 18).[2]

[1] Plaintiffs style Count XV as a claim for an injunction facilitating recovery of their property. As discussed below, *see infra* Part III.I, the Court interprets this as a replevin claim.

[2] One defendant also objected to the Court's exercise of personal jurisdiction, but it subsequently withdrew that objection. (Defs.' Reply 2 n.1, ECF No. 32.)

As explained below, the Court will grant in part and deny in part the motion to dismiss. The Court will dismiss Plaintiffs' claims for shareholder oppression and breach of contract, and deny the motion to dismiss regarding all other claims.

## I. BACKGROUND

### A. The Parties

Plaintiff Creative Products International ("CPI") is a Michigan company that manufactures and sells industrial cleaning equipment and supplies. Plaintiff Dave Maurer is CPI's sole shareholder, director, and officer, as well as the sole member and manager of Plaintiff iTeam, LLC. Defendant Future Cleaning Technologies ("FCT") is a Dutch company whose director and principal officer is Defendant Frank van de Ven. FCT's parent company is Defendant i-team Global B.V. ("Global"), a Dutch company whose director, principal officer, and part-owner is Van de Ven. Van de Ven and/or Global also own Defendants i-invest B.V. ("i-invest") and i-team professional, B.V. ("ITP"), both Dutch companies. Van de Ven is a director and principal officer of ITP. Defendant i-team North America, Inc. ("ITNA")—formerly iSolutionsUSA LLC ("ISU")—is a Michigan corporation jointly owned by CPI (holding a 49% stake) and i-invest (holding a 51% stake). Defendant Peter de Roo was the president (and later chief executive) of ITNA. Defendant Chad Harmsen was ITNA's customer service manager.

The following diagram illustrates the convoluted relationship between the parties:




**B. Development of the i-Mop**

The business relationship between Plaintiffs and Defendants began in 2014. Van de Ven approached Maurer with a proposal for a new product, the "i-mop," which is a combined vacuum and micro scrubber for cleaning hard floors. (Compl. ¶¶ 34–35, ECF No. 1.) As director of CPI, Maurer had significant experience in the cleaning equipment industry, and he agreed to help develop the product with a team of engineers. (*See id.* ¶¶ 36–37.) The i-mop launched in late 2014 or early 2015. (*See id.* ¶¶ 39–40.)

As compensation for Maurer's work on the product, Van de Ven agreed that CPI would have exclusive North American distribution rights for the i-mop. (*See id.* ¶ 41.) CPI began purchasing i-mops and reselling them to distributors. (*See id.* ¶ 42.) CPI also rebranded some of its other products as "i-range" products so that it could advertise the i-mop as one part of a cohesive

product line. (*Id.* ¶ 44.) Maurer began planning a $5 million "Innovation Center" in Holland, Michigan, where CPI would conduct business operations and showcase products to clients. (*Id.* ¶ 49.)

**C. The 2018 Agreement**

In 2016, Van de Ven told Maurer that their i-mop distribution deal would need to change. Van de Ven had made a deal with Tennant Company (not a party), a cleaning equipment manufacturer, and was giving North American i-mop distribution rights to Tennant. (*See id.* ¶ 53.) After negotiations between Van de Ven and Maurer, the parties settled on a new business arrangement memorialized in a 2018 agreement. That agreement was initially drafted as a "term sheet," with an expectation that it would be fleshed out later, but the parties subsequently agreed to abide by the terms as written. (2018 Agreement, ECF No. 1-4; Compl. ¶ 58.)

The 2018 agreement provided for the formation of a new company, ISU, managed by Maurer. Van de Ven's company i-invest contributed $2 million for a 51% stake, and CPI received a 49% stake in exchange for transferring its i-mop distribution rights and its customer list to ISU. (Compl. ¶ 59.) According to the complaint, the parties agreed (although apparently did not specify in writing) that Tennant would be primarily responsible for distributing i-mops, while ISU would receive royalties for i-mop sales Tennant made to a set of "legacy" clients who had previously worked with CPI. (*See id.* ¶¶ 64, 68.) CPI also retained the right to sell i-mops to Medline, a large medical supply company. (*Id.* ¶ 65.) ISU would sell i-range equipment and CPI's line of "microfiber" products. CPI and ISU planned to be co-tenants at the Innovation Center and share employees. (*Id.* ¶¶ 70–71.) CPI and iTeam invested over $600,000 in furnishings and equipment for the Innovation Center. (*Id.* ¶ 71.) Global and i-invest also agreed to provide marketing services and support to ISU. ISU's operations were expected to be funded by credit from Rabobank. (*Id.* ¶ 72.)

But many of these plans never came to fruition. Though ISU was supposed to receive royalties for Tennant's sales of i-mops to CPI's legacy clients, Tennant refused to sell to those clients, causing them to buy i-mops from other distributors (who in turn bought the i-mops from Tennant). (*See id.* ¶ 75.) Moreover, CPI retained the right to sell i-mops to Medline, but Tennant sold i-mops at a lower price and undercut Medline's ability to resell them, giving Medline little reason to buy i-mops from CPI. (*See id.* ¶ 77.) Global and i-invest never obtained financing from Rabobank. (*See id.* ¶ 79.) Van de Ven told Maurer that Global would fund ISU instead, but the funding never materialized; eventually, Van de Ven contributed funding on the condition that CPI would extend a $490,000 loan to ISU. (*See id.* ¶¶ 83–84.) Global also did not provide the promised marketing services for ISU; it focused on marketing the i-mop, which primarily benefitted Tennant, rather than on ISU's products. (*Id.* ¶ 85.)

**D. The 2019 Agreement**

The following year, the parties made significant changes to their business arrangement, memorialized in a 2019 agreement. (2019 Agreement, ECF No. 1-5.) ISU was reorganized and renamed to ITNA. Under the new arrangement, Tennant would no longer pay royalties for any legacy accounts other than Medline. (Compl. ¶ 89.) ITNA would sell CPI microfiber products to all other customers after purchasing them directly from vendors. (*Id.* ¶ 93.) CPI made an additional loan to ITNA of about $690,000.00. (*See id.* ¶ 96.) Van de Ven promised that Global would provide more marketing support for ITNA. (*Id.* ¶¶ 90–91.)

However, like the previous agreement, the new agreement had a troubled implementation. Maurer initially collaborated with Tennant on a marketing plan, but Tennant's representatives ended up undermining the collaboration by telling customers to buy Tennant's own competing products instead of ITNA's products. (*Id.* ¶¶ 101–05.) Van de Ven also allocated some of Global's i-mop-related expenses to ITNA, even though ITNA was largely precluded from selling i-mops.

(*Id.* ¶ 109.) Moreover, while the Innovation Center was under construction, Van de Ven abruptly demanded that the design be changed, which cost $1.2 million and delayed completion of the project by a year. Van de Ven agreed to pay for the design changes himself, but later refused to make the payment, forcing i-team and Maurer to cover the cost. (*Id.* ¶¶ 99–100.) Due to funding issues, i-team decided to sell the Innovation Center to a third party, which leased the space back to ITNA and CPI. (*Id.* ¶¶ 112–13.)

**E. Relationship Breakdown**

In 2022, Maurer decided that CPI should end its association with ITNA and return to focusing on its microfiber products. Maurer spent several months trying to negotiate a separation deal, but the parties could not reach an agreement. (*Id.* ¶¶ 125–26.) During this time—allegedly to obtain leverage over CPI—Global stopped funding ITNA's purchase of inventory, which prevented ITNA from fulfilling orders and caused it to permanently lose some customers. (*Id.* ¶¶ 128–29.)

In October of 2022, Van de Ven promised that Global would provide funding to ITNA for inventory. (*Id.* ¶ 130.) Global did eventually provide funds to ITNA, but only on the condition that Maurer also loan ITNA an additional $1.5 million; the prior loans from CPI to ITNA were also restructured. (*Id.* ¶ 132.) Global and its affiliates also began to secretly buy CPI microfiber products from the manufacturers, circumventing the parties' agreement and incurring heightened freight charges and duties. Global passed the freight charges and duties on to ITNA, and charged ITNA an additional 18% surcharge. (*Id.* ¶¶ 133–34.)

The relationship between the parties ultimately broke down in 2023. In April of that year, Van de Ven removed Maurer as manager of ITNA and installed De Roo as chief executive. (*Id.* ¶¶ 140, 147.) De Roo changed the locks on the Innovation Center and refused to give Maurer the new key; he told Maurer that he could enter the Innovation Center only during business hours and

with an ITNA chaperone. (*Id.* ¶¶ 137–38.) Maurer was ultimately allowed to remove some inventory from the Center, but he was not permitted to take furniture, equipment, or files. (*Id.* ¶ 141.) In response to De Roo changing the locks, CPI stopped paying its share of the rent; ITNA then ceased its loan payments to Maurer, leaving an outstanding balance of $1,397,018. (*Id.* ¶ 142.)

Van de Ven also began to shift business away from ITNA to other entities in which Maurer had no stake, and on at least one occasion Van de Ven instructed a Global affiliate to collect revenue for sales made by ITNA. (*Id.* ¶ 149.) On April 10, 2024, counsel for CPI sent a letter to ITNA stating that the latter company was no longer permitted to sell CPI microfiber products. (*Id.* ¶ 163.) But ITNA (as well as ITP) allegedly continues to sell the products and use CPI trademarks without permission. (*Id.* ¶ 151.) ITNA has also begun selling knockoff microfiber products that mimic CPI's. (*Id.* ¶ 154.)[3] ITNA representatives falsely told customers and sales representatives that CPI went out of business and ITNA was the sole source for CPI microfiber products. (*Id.* ¶ 153.) Moreover, De Roo warned customers away from working with Maurer or CPI by falsely telling them that Maurer stole money from ITNA. (*Id.* ¶ 155.) ITNA also provided incentives for CPI sales representatives (who had previously been trained to sell CPI's products for ITNA) to leave CPI for ITNA, and required any representatives who accepted the offer to end their relationship with CPI. (*Id.* ¶ 156.)

Plaintiffs allege that ITNA and ITP are presently infringing two of their patents: a "Cleaning System" patent, which is for a mophead that can be more quickly wetted before use (ECF No. 1-2); and a "Multi-Purpose Cleaning Trowel" patent, which is for an electronic handheld multi-surface cleaning device (ECF No. 1-3). Both patents are used in CPI's microfiber cleaning

[3] It is unclear from the complaint whether ITNA is selling both genuine and knockoff CPI products or just knockoffs.

products. (Compl. ¶¶ 162, 178.) Plaintiffs also allege that ITNA and ITP are using several federally registered trademarks without permission—marks ECART, I-CART, E SERIES, EDOUBLE, EWAVE, ETROWEL, IFIBER, ISCRUB—as well as an unregistered trademark, 4D Clean Technology. (*Id.* ¶¶ 191, 206.)

## II. LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim if it fails "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.

When considering a motion to dismiss under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017). The court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

## III. ANALYSIS

Defendants seek dismissal of all counts for failure to state a claim. As set out below, the Court finds that Plaintiffs have stated claims for patent infringement, induced patent infringement, Lanham Act trademark infringement, common-law trademark infringement, unfair competition, conversion, defamation, and replevin. However, Plaintiffs have not stated a claim for minority shareholder oppression or breach of contract.

### A. Patent Infringement

Plaintiffs allege that ITNA and ITP are selling products that infringe on two of CPI's patents: the Cleaning System patent and the Multi-Purpose Cleaning Trowel patent. Plaintiffs attached images of the allegedly infringing products to their complaint (*see* ECF Nos. 1-6, 1-7). Defendants raise several objections to the sufficiency of Plaintiffs' allegations, but all are meritless.

The product that allegedly infringes the Multi-Purpose Cleaning Trowel patent contains a CPI logo. (*See* ECF No. 1-7, PageID.126.) Defendants argue that the image is of a CPI product, not of an infringing product, so Plaintiffs have not established that Defendants are infringing CPI's patents. However, Plaintiffs respond that the product in the image is sold by Defendants—it just contains a (misleading) CPI logo. In any event, Plaintiffs have no obligation to provide photographic evidence of their claims at this stage, so the mere allegation that Defendants are selling products with specified features shared by the patented products is sufficient to state an infringement claim.

Defendants also assert that ITNA and ITP were authorized to sell CPI's products by the 2018 and 2019 agreements, so they are not committing infringement by continuing to do so. The 2018 agreement provides that ISU (the predecessor to ITNA) will "buy [CPI's products] direct from SMT factory" (2018 Agreement 4), and the 2019 agreement provides that ISU "will purchase

the inventory and fixed assets from CPI" (2019 Agreement 2). "The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008); *see Bowman v. Monsanto Co.*, 569 U.S. 278, 280 (2013) ("Under the doctrine of patent exhaustion, the authorized sale of a patented article gives the purchaser, or any subsequent owner, a right to use or resell that article."). Defendants, applying this doctrine, argue that CPI's authorization of ITNA and ITP to buy its products precludes CPI from asserting its patent rights.[4]

However, as Plaintiffs note, the patent exhaustion doctrine does not entail that the sale of a single product precludes all future patent claims related to the same design. Rather, the doctrine dictates that when a patentholder sells a particular item, it cannot assert a patent infringement claim regarding that physical item. So the fact that CPI authorized ITNA and ITP to buy products several years ago does not preclude it from asserting its patent rights over products presently sold using the same design. *See Bowman*, 569 U.S. at 280 (holding that sale of a patented item "does not allow the purchaser to make new copies of the patented invention"). Of course, if ITNA and ITP are currently authorized to buy CPI's goods from the manufacturer, then the patent exhaustion doctrine may prevent CPI from asserting its patent rights over those goods. The question, then, is whether the authorizations in the 2018 and 2019 agreements are still operative.

Plaintiffs sufficiently allege that those previous authorizations have been terminated. They state that in April of 2024, CPI sent a letter to Defendants revoking permission to sell CPI's products. In response, Defendants assert that Plaintiffs lacked the authority to unilaterally revoke the contract. The 2018 and 2019 agreements do not contain any provisions regarding duration or

---

[4] Defendants appear to treat the authorizations in the 2018 and 2019 agreements as applying to both ITNA and ITP, though the documents refer only to ITNA (or ISU, its predecessor). But Plaintiffs do not discuss this issue, and the Court finds no need to address it here.

revocation. "[W]here the parties have not agreed upon the term, duration, or manner of termination of such an agreement it is generally deemed to be terminable at the will of either party because they have not agreed otherwise." *Arevelo v. Arevalo*, No. 285548, 2010 WL 1330636, at *13 (Mich. Ct. App. Apr. 6, 2010) (quoting *Lichnovsky v. Ziebart Int'l Corp.*, 324 N.W.2d 732, 738–39 (Mich. 1982)). There are exceptions to this rule—for example, some courts have refused to allow "a manufacturer or licensor [to] exercis[e] an unrestricted power to terminate an agreement" if at-will revocation could "create undue hardship for the other party." *Lichnovsky*, 324 N.W.2d at 741 n.26. But Defendants do not argue that any such exceptions apply.

Based on the allegations in the complaint, the authorizations in the 2018 and 2019 agreements were terminable at will and were terminated by Plaintiffs in April of 2024 at the latest. Thus, even if the 2018 and 2019 authorizations established an implied patent license, that license expired. Moreover, Plaintiffs allege that ITNA is selling knockoff versions of their products. Plaintiffs' authorization for ITNA to buy and sell genuine CPI products would not authorize it to sell knockoffs as well, so that act would constitute infringement regardless of the validity of Plaintiffs' revocation.[5]

In short, Plaintiffs have stated a claim for patent infringement.

**B. Induced Patent Infringement**

Plaintiffs also bring a claim against Van de Ven for inducing ITNA and ITP to infringe CPI's patents. Plaintiffs allege that Van de Ven has knowledge of the patents in question and effective control over ITNA and ITP, and that he intended for the companies to sell infringing products. (Compl. ¶¶ 171, 187.) "For an allegation of induced infringement to survive a motion

[5] Defendants argue that the Court should dismiss Plaintiffs' infringement claims insofar as they relate to any genuine CPI products sold by ITNA or ITP between 2018 and April of 2024. However, given that Plaintiffs have stated an infringement claim, the Court finds it unnecessary to delineate the exact temporal bounds of that claim, especially given that the scope of Plaintiffs' authorization to Defendants may depend on facts not currently in the record.

to dismiss, a complaint must plead facts plausibly showing that the accused infringer specifically intended another party to infringe the patent and knew that the other party's acts constituted infringement." *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017). Defendants argue that Plaintiffs' allegations regarding Van de Ven's knowledge and control are too conclusory, but the Court disagrees. Under the Federal Rules, "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see Smith v. Gen. Motors LLC*, 988 F.3d 873, 883 (6th Cir. 2021) ("Rule 9(b) . . . permits general allegations about the defendant's knowledge to avoid a 12(b)(6) motion to dismiss."). Moreover, at this stage the Court must draw all reasonable inferences in Plaintiffs' favor. It is quite reasonable to infer that Van de Ven knew of CPI's patents given that he had been working with CPI for years to sell its cleaning products. And Van de Ven's control over ITNA and ITP makes it reasonable to attribute those companies' actions to him. Thus, Plaintiffs have stated a claim for induced infringement.

**C. Trademark Infringement**

Plaintiffs also allege that Defendants are unlawfully using nine of CPI's trademarks: ECART, I-CART, E SERIES, EDOUBLE, EWAVE, ETROWEL, IFIBER, ISCRUB, and 4D Clean Technology. As with Plaintiffs' patent infringement claims, Defendants argue that they were authorized to use these trademarks by the 2018 and 2019 agreements, which permitted them to sell CPI's products. Once again, Plaintiffs assert that insofar as Defendants had such permission, the April 2024 letter revoked it. Defendants respond that the 2024 letter—which they filed along with their reply brief—does not mention trademarks, and states only that "CPI heretofore revokes any express or implied permission, authority or license to sell any CPI patented product." (4/10/2024 Letter 3, ECF No. 32-1.)

Defendants' argument fails for a number of reasons. First, the Court may not consider the attached letter in resolving the motion to dismiss. Although the letter is

"referred to in the Complaint and . . . central to the claims contained therein," it was not "attached to defendant's motion to dismiss," *Bassett*, 528 F.3d at 430, but rather to Defendants' reply brief. Perhaps the distinction seems pedantic, but "a party cannot raise new issues in a reply brief," *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 599 (N.D. Ohio 2004), so it stands to reason that a party also may not introduce a new document to the record in a reply brief; in both cases, the opposing party has no chance to respond. Second, the version of the letter attached to Defendants' reply is heavily redacted because it contains settlement discussions; without the full text of the letter, the Court cannot determine whether the letter accords with or contradicts Plaintiffs' characterization. Finally, the excerpted text that Defendants point to arguably *does* constitute a revocation of their right to use CPI's trademarks. It is true that the text mentions only products, not trademarks, but Defendants acknowledge that their original right to use the trademarks was implied by the authorization to sell CPI's products—so by revoking that authorization, CPI appears to have revoked the associated trademark permissions as well. Ultimately, the exact meaning of the letter may depend on context and the parties' course of dealing, so this dispute requires further factual development. At this stage, the Court finds that Plaintiffs have sufficiently alleged a trademark infringement claim.

Defendants also point out that the pictures Plaintiffs attached to their complaint showing the allegedly infringing trademark uses do not include all nine of the trademarks that Plaintiffs claim Defendants are infringing. But as noted above, Plaintiffs are not required to submit evidence at this stage; the mere allegation of infringement is enough. Defendants contend that Plaintiffs' allegations are not specific enough, but the Court finds this contention unavailing. Plaintiffs state that Defendants are selling microfiber cleaning products containing a specific set of trademarks (*see* Compl. ¶¶ 151, 191, 208–09, 215); these allegations sufficiently put Defendants on notice

regarding Plaintiffs' claims. Defendants cite no authority for the notion that Plaintiffs must provide more detail regarding the specific products or the time and place they were sold.

Defendants additionally argue that Plaintiffs' common-law trademark infringement claim is flawed because it refers to "Defendants" collectively rather than specifying which defendant took which action. But "[t]he fact that defendants are accused collectively does not [itself] render the complaint deficient." *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000). "There is no flaw in a pleading . . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016); *see Clark v. Pizza Baker, Inc.*, No. 2:18-cv-157, 2019 WL 4601930, at *9 (S.D. Ohio Sep. 23, 2019) ("Defendants have cited no Sixth Circuit authority, and this Court has located none, prohibiting a plaintiff from grouping together several defendants and alleging that all of them took the same action."). Plaintiffs allege that all of the defendants—who are comprised of closely related entities and their managers or employees—sold items with Plaintiffs' trademarks. This allegation is sufficient to survive a motion to dismiss. And though the allegations against some of the defendants are made on information and belief, that form of pleading is permissible. *AHC Holdings, Inc. v. MSU Health Care, Inc.*, 824 F. Supp. 3d 622, 646 (W.D. Mich. 2026) ("The *Twombly* plausibility standard does not prevent a plaintiff from pleading facts alleged on information and belief where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." (cleaned up)).

Finally, Defendants contend that Plaintiffs have not established that 4D Clean Technology is a valid trademark. Although 4D Clean Technology is not federally registered, an unregistered trademark may nonetheless exist as a matter of state common law. "[A]t common law, trademarks

only receive legal protection when they are (1) used in connection with the sale and advertising of products or services, and (2) distinctive, in that consumers understand the mark to designate goods or services as the product of a particular manufacturer or trader." *Janet Travis, Inc. v. Preka Holdings, LLC*, 856 N.W.2d 206, 217 (Mich. Ct. App. 2014) (quotation marks omitted).[6]

Plaintiffs allege that CPI uses the term "4D Clean Technology" "in commerce throughout the United States in connection with its promotion and sale of its CPI Microfiber Products." (Compl. ¶ 206.) This allegation satisfies the first requirement.

As to the second, Plaintiffs allege that "4D Clean Technology is distinctive and associated in the marketplace with CPI Microfiber Products." (*Id.* ¶ 207.) To determine whether a mark is distinctive, courts consider which of four categories it falls into: "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Janet Travis,* 856 N.W.2d at 218. Generic terms—i.e., terms "commonly used as the name or description of a class of goods"—cannot be trademarks "because they are unable to distinguish a good as originating from a particular source." *Id.* at 218–19. The same is generally true of descriptive terms, although these terms can acquire a trademarkable meaning if they "become associated in the minds of purchasers or customers with the source or origin of goods or services rather than with the goods or services themselves." *Id.*

By contrast, trademarks are generally valid for suggestive terms, which "require[] imagination, thought and perception to reach a conclusion as to the nature of goods," *id.* at 218 n.26; arbitrary terms, which are used without any connection to their standard meaning, *id.* at 218 n.25; and fanciful terms, which have no standard meaning at all, *id.* Plaintiffs appear to be using "4D Clean Technology" as a suggestive term. They explain that the term "4D" refers to "the four

---

[6] Despite the international nature of the business dealings here, the parties do not raise any choice-of-law issues and appear to assume that Michigan law applies to all of Plaintiffs' non-federal claims. The Court will therefore apply Michigan law throughout its analysis. *See Citizens Ins. Co. of the Midwest v. McNeeley*, No. 23-1794, 2025 WL 1178387, at *1 (6th Cir. Apr. 23, 2025) ("The parties agree, so we may assume, that Michigan law applies here.").

dimensions [of] walls and furniture, floors, ceilings and air." (Comp. ¶ 24.) Although there is a connection between the standard use of "four-dimensional" and Plaintiffs' mark, it is an attenuated connection that requires considerable imaginative leaps. Thus, Plaintiffs have met the second requirement for a common-law trademark.

In sum, Plaintiffs have sufficiently alleged that 4D Clean Technology is a valid trademark, and that Defendants are infringing it.

**D. Unfair Competition**

"Unfair competition ordinarily consists in the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival . . . , thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competitor." *Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 484 (6th Cir. 2023) (omission in original) (quoting *Peninsular Stove Co. v. Augst*, 285 N.W. 24, 26 (Mich. 1939)). "Among the elements that a party must prove are a likelihood of confusion to the public, deception that is the probable result of the defendant's actions, and actual competition between the parties." *Id.* (citations omitted).

Plaintiffs allege that Defendants have engaged in unfair competition by using CPI's trademarks and by telling customers that CPI went out of business and ITNA is the only remaining source of CPI products. Defendants' primary objection is that Plaintiffs do not specify the occasions on which Defendants allegedly made these representations to their customers or the particular defendants that made them. But as noted above, Plaintiffs are permitted to allege that Defendants acted collectively. Given the close relationship between all of the defendants, it is sufficient for Plaintiffs to allege that Defendants have collectively engaged in unfair competition. And Defendants cite no authority for the proposition that Plaintiffs must specify exactly who Defendants made the representations to.

Defendants also assert that "suggesting 'that they have succeeded CPI' . . . is not 'simulation of the name, symbols, or devices employed by a business rival' and does not constitute unfair competition under Michigan law." (Defs.' Br. in Supp. 26, ECF No. 19 (cleaned up).) But Plaintiffs do not just allege that Defendants told customers ITNA had succeeded CPI; they allege that Defendants claimed Plaintiffs had gone out of business and ITNA was the only source for CPI products. Those representations were apparently an attempt to trick customers into thinking Defendants were selling CPI products—in other words, "the simulation by one person, for the purpose of deceiving the public, of the name . . . employed by a business rival." Thus, Plaintiffs have stated a claim for unfair competition.

**E. Shareholder Oppression**

CPI brings a shareholder oppression claim against ITNA, Global, and Van de Ven under Mich. Comp. Laws § 450.1489, which "provide[s] a cause of action to redress certain wrongs by those in control of a closely held corporation when the acts interfere with a shareholder's property rights." *Franks v. Franks*, 944 N.W.2d 388, 400 (Mich. Ct. App. 2019). "Michigan courts have consistently held that the purpose of § 450.1489 is to protect minority shareholders . . . from overreaching and heavy handed actions by the majority." *Blankenship v. Superior Controls, Inc.*, 135 F. Supp. 3d 608, 618 (E.D. Mich. 2015).

Plaintiffs argue that Defendants harmed CPI as a shareholder in the following ways: shifting business away from ITNA to other entities in which CPI had no stake; invoicing a customer for sales made by ITNA; failing to provide ITNA with funding to purchase inventory; secretly buying CPI products from manufacturers; imposing an 18% surcharge on ITNA; preventing ITNA from working with outside sales representatives and customers; allocating Global's i-mop-related expenses to ITNA; removing Maurer as manager of ITNA and locking him out of the Innovation Center; and diminishing ITNA's enterprise value.

A defendant's conduct towards a minority shareholder is only actionable under § 450.1489 if it "substantially interferes with the interests of the shareholder *as a shareholder*." Mich. Comp. Laws § 450.1489(3) (emphasis added). Conduct that harms a company but not its shareholders (as shareholders) is actionable only via a derivative suit brought on behalf of the company, *see Murphy v. Inman*, 983 N.W.2d 354, 369 (Mich. 2022), which Plaintiffs do not bring. Many of Defendants' alleged actions—such as shifting funds away from ITNA or charging ITNA excess costs—harmed ITNA itself, and therefore indirectly harmed CPI. But the question remains whether those actions harmed CPI *in its capacity as a shareholder*. Although the case law is not abundantly clear on this point, it appears that Michigan courts would consider the alleged harms to *not* be suffered by CPI as a shareholder, and thus to not be actionable via a direct suit under § 450.1489.

Michigan courts have "distinguished between general duties to the corporation, which indirectly benefit the shareholders, and certain limited duties owed directly to the shareholders." *Meathe v. Ret*, 547 F. App'x 683, 689 (6th Cir. 2013). The duties owed directly to shareholders include "the right to vote, inspect the books, and receive distributions." *Madugula v. Taub*, 853 N.W.2d 75, 93 (Mich. 2014); *see Bordine v. Bordine*, No. 363655, 2023 WL 8295883, at *5 (Mich. Ct. App. Nov. 30, 2023). If a defendant's actions harm the company but do not "violat[e] . . . a duty owed directly to the [shareholders] that is independent of the corporation," a shareholder may not bring a direct suit. *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 278 (Mich. Ct. App. 2003).

Plaintiffs do not allege that Defendants abridged CPI's right to vote, inspect corporate records, or receive distributions. Even if CPI was harmed by Defendants' conduct, it was not harmed in a manner independent of ITNA itself. It is true that CPI may have received fewer

distributions from ITNA because Defendants' choices made ITNA less profitable. But the mere fact that a company loses money (and therefore makes fewer distributions to shareholders) cannot qualify as an abridgement of the right to distributions, or else the distinction between a harm to the corporation and a harm to shareholders would be meaningless—after all, any action that makes a corporation less profitable can be said to indirectly reduce future distributions. The same is true of Plaintiffs' claim that Defendants reduced ITNA's enterprise value: almost any harm to a company will reduce its value, so a plaintiff must show more to establish a direct shareholder injury.

The Michigan Court of Appeals' decision in *Bordine* is instructive on this point. There, two shareholders of Bordine Investment Co. ("BIC") sued the other three shareholders under § 450.1489 for minority shareholder oppression. Among other things, the plaintiffs claimed that the defendants had refused to require BIC's tenant—which was a company owned by two of the defendants—to obtain fire insurance. The court acknowledged that the defendants' conduct could harm BIC, and thus presumably indirectly harm the plaintiffs, but it held that the conduct did "not interfere with plaintiffs' interests *as shareholders*" because it did "not affect their right to vote, to inspect books, or to receive distributions." *Bordine*, 2023 WL 8295883, at *5. Similarly, Defendants' alleged decision to direct money away from ITNA to their own ventures may harm the company and thus its shareholders, but it does not harm the shareholders *as shareholders*.

The Michigan Court of Appeals applied the same principle in *Haarer v. Vreba-Hoff Dairy Dev, LLC*, No. 260001, 2006 WL 2380885 (Mich. Ct. App. Aug. 17, 2006), where the plaintiffs sued the defendants for mismanaging a company that ultimately had to declare bankruptcy. The court held that the plaintiffs could not bring a direct suit under § 450.1489 because their "claims are not unique, but rather they are claims that any shareholder could assert, and as such, belong to

the corporation itself." *Haarer*, 2006 WL 2380885, at *1. The court explained that "although [the] plaintiffs claim[ed] to be uniquely affected by harm to the corporation because of their status as shareholders," they were not harmed *as shareholders* because the "alleged harms all stem[med] from some harm to the corporation." *Id.* This case therefore reinforces the principle that harm caused to a shareholder as a consequence of harm caused to a corporation is not actionable under § 450.1489.

However, some Michigan case law cuts in the opposite direction. In *Lozowski v. Benedict*, No. 257219, 2006 WL 287406, at *2 (Mich. Ct. App. Feb. 7, 2006), the plaintiff sued the defendants for "funnel[ing] corporate funds" away from the corporation in which plaintiff held stock "to other corporations in which [the defendants] held interests." *Id.* The plaintiff asserted that the defendants' conduct had harmed him uniquely (and not harmed any other shareholders) "because he and defendants were the only three shareholders and defendants stood to benefit from their own alleged misconduct." *Id.* at *2. The court held that the plaintiff could not bring a claim on his own behalf for breach of fiduciary duty because a shareholder cannot bring a direct suit "when the acts complained of result in damage both to the corporation and to the individual." *Id.* at *3. However, the court held that the plaintiff *had* stated a claim for minority shareholder oppression because he had been harmed in his capacity "as a shareholder." *Id.* Thus, the court allowed his § 450.1489 claim to proceed.

*Lozowski* seems to contradict *Bordine* and *Haarer*. More puzzling, *Lozowski*'s holdings regarding the breach of fiduciary duty claim and the shareholder oppression claim appear at odds with each other—why would the same harm qualify as harm to the shareholder for purposes of one claim but merely harm to the corporation for purposes of the other? Essentially, *Lozowski* treats a shareholder oppression claim under § 450.1489 as an exception to the general rule that

shareholders may not bring a direct suit for harm to the company. But the Court is unaware of any authority explicitly supporting such a principle, and *Bordine* and *Haarer* implicitly reject it. Admittedly, one might find support in the statutory language, which creates a cause of action for conduct that is "oppressive to the corporation or to the shareholder." Mich. Comp. Laws § 450.1489(1). The word "or" implies that conduct could be actionable because it harms the corporation even if it does not harm a shareholder. *Cf. Estes v. Idea Eng'g & Fabrications, Inc.*, 649 N.W.2d 84, 91 (Mich. Ct. App. 2002) ("A § 489 suit seeks to redress oppression that injures either the corporation or the shareholder . . . ."). But the statute also clarifies that oppressive conduct must "substantially interfere[] with the interests of the shareholder as a shareholder." Mich. Comp. Laws § 450.1489(3). Thus, the statute appears to deliberately preserve the distinction between harm to the corporation that may impact the shareholders and harm to the shareholders themselves, only the latter of which is actionable via direct suit. Accordingly, the Court is unconvinced by *Lozowski*'s apparent distinction between common-law shareholder suits and § 450.1489 suits.

There also exists non-binding federal case law concurring with *Lozowski*'s holding, but the Court finds it no more persuasive. In *Billstein v. Goodman*, No. 08-13415, 2011 WL 13161321, at *8 (E.D. Mich. June 14, 2011), the district court cited *Lozowski* for the proposition that "funneling corporate funds to other corporations owned by controlling shareholders and diversion of corporate opportunities can be oppressive conduct," without addressing the distinction between direct and derivative suits. In *Weiner v. Weiner*, No. 1:06-cv-642, 2008 WL 746960, at *3 (W.D. Mich. Mar. 18, 2008), the district court held that a defendant who had shifted money away from a corporation to himself had harmed the plaintiff as a shareholder, but the court provided scant reasoning in support.

Finally, in *Bromley v. Bromley*, No. 05-71798, 2006 WL 2861875, at *5 (E.D. Mich. Oct. 4, 2006), the district court held that "diverting corporate opportunities and assets to other entities" or making "investments deemed not to be in the corporation's best interest" qualified as harms to individual shareholders supporting direct suit under § 450.1489. But the court anchored this conclusion in the incorrect assumption that "the type of conduct amounting to a breach of fiduciary duties in close corporations is the type of conduct prohibited by § 450.1489." *Bromley*, 2006 WL 2861875, at *5. To the contrary, conduct that breaches a director's fiduciary duties *to the company* but does not independently harm the shareholders is not prohibited by § 450.1489. *See Pero v. Edwards*, No. 368897, 2025 WL 2147466, at *3 (Mich. Ct. App. July 29, 2025) ("While it is true that corporate directors owe a duty to produce returns for shareholders, this is in relation to a director's fiduciary duties. Thus, the caselaw on which plaintiff relies applies to claims for *breach of fiduciary duties*, not shareholder oppression, [and is] inapplicable to this case." (citation omitted)).

In short, there is no reason to read § 450.1489 as a departure from the background rule that a shareholder may only bring a direct suit for actions that harm them directly as a shareholder. *Cf. Al-Hajjaj v. Hartford Accident & Indem. Co.*, 5 N.W.3d 353, 358 (Mich. Ct. App. 2023) ("[T]his Court must read the statutory language in light of the common law except to the extent that the Legislature has abrogated or modified it." (quotation marks omitted)).

One might wonder whether Plaintiffs' claim is supported by case law holding that direct suit is permissible where a shareholder "sustain[s] a loss separate and distinct from that of other stockholders generally." *Meathe*, 547 F. App'x at 689 (quoting *Christner v. Anderson, Nietzke & Co., PC*, 444 N.W.2d 779, 783 (Mich. 1989)); *see Mazur v. Kammer*, No. 275298, 2008 WL 1989659, at *4 (Mich. Ct. App. May 8, 2008). Arguably, the harm caused to CPI affected CPI

more than ITNA's other shareholder, i-invest, because much of the harm was ultimately to the benefit of Van de Ven (who owns i-invest). But this argument fails for two reasons.

First, the separate-and-distinct principle appears to still be subject to the rule that "where the alleged injury to the individual results only from the injury to the corporation, the injury is merely derivative and the individual does not have a right of action against the third party." *Mazur*, 2008 WL 1989659, at *4. So the mere fact that one shareholder was harmed and another was not is insufficient to support a direct suit if the harm still resulted from injury to the corporation. In fact, one might understand the separate-and-distinct exception as merely another way to cash out the distinction between harm to a shareholder and to a company—harm to the company generally impacts every shareholder, whereas harm to the shareholders as shareholders impacts them individually.

Second, it is not truly accurate to say that CPI sustained a loss distinct from i-invest. Any harm caused to ITNA affected i-invest and CPI equally as shareholders. Some of that harm was *offset* by a benefit to i-invest or Van de Ven, given that money was allegedly transferred from ITNA to Van de Ven's companies. But insofar as Van de Ven's management of ITNA caused ITNA to not distribute dividends to its shareholders, both shareholders felt that harm equally. There was thus no unique harm to CPI.

Finally, two of the acts Plaintiffs list in support of CPI's shareholder oppression claim did not cause harm to ITNA—so the harm to the shareholders was not secondhand—but these acts fail to support a shareholder oppression claim for independent reasons. First, Plaintiffs allege that Van de Ven (through i-invest) used his role as majority shareholder to remove Maurer from his management position at ITNA. It is true that § 450.1489 authorizes a shareholder oppression claim based on harm related to "the termination of employment or limitations on employment benefits

to the extent that the actions interfere with distributions or other shareholder interests disproportionately as to the affected shareholder." Mich. Comp. Laws § 450.1489(3). However, Maurer was not a shareholder of ITNA—CPI was. Thus, it cannot be said that removing Maurer interfered with CPI's right to distributions or any other shareholder interest. Second, Plaintiffs allege that Van de Ven locked Maurer and CPI out of the Innovation Center. But this act impacted Maurer as an employee, and perhaps CPI as a business partner—it is not clear how the lockout impacted CPI as a *shareholder*.

In sum, Plaintiffs' claim for minority shareholder oppression cannot be brought as a direct suit, and must be brought derivatively (if it can be brought at all). And Plaintiffs have not attempted to raise a derivative claim. Therefore, their shareholder oppression claim will be dismissed.

**F. Defamation**

Maurer brings a defamation claim against ITNA based on the allegation that De Roo falsely told customers Maurer stole money. The elements of a defamation claim are

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.

*Reighard v. ESPN, Inc.*, 991 N.W.2d 803, 810 (Mich. Ct. App. 2022). Each of the elements appears to be met here. The accusation that Maurer committed theft is allegedly false and certainly defamatory; it was communicated to ITNA's customers; De Roo was presumably at fault insofar as he knew that Maurer had not committed theft; and an accusation of theft qualifies as defamation per se because theft is a crime, *see Burden v. Elias Bros. Big Boy Rests.*, 613 N.W.2d 378, 381 (Mich. Ct. App. 2000) ("[W]ords charging the commission of a crime are defamatory per se . . . .").

Defendants argue that Maurer has not adequately pled his defamation claim because Michigan courts require a defamation claimant to "specifically plead[]" "the defamatory words, the connection between the plaintiff and the defamatory words, and the publication of the alleged defamatory words." *Gonyea v. Motor Parts Fed. Credit Union*, 480 N.W.2d 297, 299 (Mich. Ct. App. 1991). Plaintiffs respond that this requirement is a pleading standard that is superseded by the Federal Rules of Civil Procedure.

When a federal court hears a state law claim—whether sitting in diversity or (as here) exercising supplemental jurisdiction—it applies state law to substantive questions and federal law to procedural questions. *See Berk v. Choy*, 146 S. Ct. 546, 552 (2026) (citing 28 U.S.C. § 1642)). If "a Federal Rule of Civil Procedure is on point," there is no need to consider whether the otherwise-applicable state rule is procedural or substantive. *Id.* "If a Federal Rule answers the disputed question, it governs, unless it 'exceeds statutory authorization or Congress's rulemaking power.'" *Id.* at 552–53 (quoting *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010)).

The question here is how much detail Plaintiffs must provide in their complaint to overcome a motion to dismiss. Rule 8 of the Federal Rules of Civil Procedure answers this question because "[i]t prescribes the information a plaintiff must present about the merits of his claim at the outset of litigation: 'a short and plain statement of the claim showing that [he] is entitled to relief.'" *Id.* at 553 (quoting Fed. R. Civ. P. 8(a)(2)). The Supreme Court has interpreted the Federal Rules as requiring a plaintiff "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (alteration in original) (quoting *Conley*, 355 U.S. at 47). While the Federal Rules impose heightened pleading standards on certain claims—a party "alleging fraud or mistake . . . must state with particularity the circumstances

constituting fraud or mistake," Fed. R. Civ. P. 9(b)—a defamation claim does not fall under that higher standard, and therefore is subject to the liberal standards of notice pleading.

Michigan's rule that a plaintiff must plead the specific circumstances surrounding the defamatory statement contradicts the pleading standard established by Rule 8. *See Armstrong v. Shirvell*, 596 F. App'x 433, 444 (6th Cir. 2015) (finding that under federal pleading standards a plaintiff is "not required to allege the circumstances of defamation with particularity"). Accordingly, "Rule 8 governs so long as it is valid under the Rules Enabling Act, which requires that Federal Rules be procedural rather than substantive." *Berk*, 146 S. Ct. at 556. And the Supreme Court has held that Rule 8 is valid because it "really regulates procedure." *Id.* (quoting *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941)). Thus, Rule 8's liberal pleading standard supplants Michigan's rule.

This conclusion aligns with the Sixth Circuit's holding in *Armstrong*, 596 F. App'x at 444, as well as the holdings of numerous district courts, *see Stryker Corp. v. Ridgeway*, No. 1:13-cv-1066, 2015 WL 5308038, at *10 (W.D. Mich. Sep. 10, 2015); *AHC Holdings*, 824 F. Supp. 3d at 641; *LaRue v. Mortg. Elec. Registration Sys., Inc.*, No. 1:12-cv-68, 2012 WL 3886876, at *4 (W.D. Mich. Sep. 6, 2012); *State Farm Fire & Cas. Co. v. Allied & Assocs.*, 860 F. Supp. 2d 432, 447 (E.D. Mich. 2012); *Cherry Indus. LLC v. Pangrle*, No. 24-cv-12060, 2025 WL 2426301, at *13 (E.D. Mich. Aug. 21, 2025); *JM Adjustment Servs., LLC v. J.P. Morgan Chase Bank, N.A.*, No. 16-10630, 2018 WL 1168940, at *10 (E.D. Mich. Mar. 6, 2018).

Admittedly, there is also a significant amount of case law (including from this Court) applying Michigan's heightened pleading standard to defamation claims, usually without any analysis. *See Ryniewicz v. Clarivate Analytics*, 803 F. App'x 858, 867 (6th Cir. 2020); *Boladian v. UMG Recordings, Inc.*, 123 F. App'x 165 (6th Cir. 2005); *Kahlich v. City of Grosse Pointe*

*Farms*, 120 F. App'x 580, 586 (6th Cir. 2005); *Bhan v. Battle Creek Health Sys.*, 579 F. App'x 438, 446 (6th Cir. 2014); *Fox v. Kitch, Drutchas, Wagner, Valitutti & Sherbrook P.C.*, No. 07-10240, 2008 WL 11626313, at *8 (E.D. Mich. Feb. 6, 2008); *Davis v. Med-1 Occupational Health Servs.*, No. 1:23-cv-426, 2023 WL 5533498, at *5 (W.D. Mich. Aug. 3, 2023), *R. & R. approved*, No. 1:23-cv-426, 2023 WL 5529782 (W.D. Mich. Aug. 28, 2023); *Al Qassimi Academy v. Abuhaltam*, No. 1:23-cv-289, 2023 WL 10553180, at *2 (W.D. Mich. Dec. 4, 2023); *Mich. Dessert Corp. v. Baldwin Richardson Foods, Inc.*, No. 06-15726, 2007 WL 851001, at *5 (E.D. Mich. Mar. 15, 2007); *Stencel v. Augat Wiring Sys.*, 173 F. Supp. 2d 669, 680 (E.D. Mich. 2001); *Kelly v. Daily Beast Co.*, No. 1:22-cv-482, 2022 WL 17546616, at *4 (W.D. Mich. Dec. 9, 2022); *Shafi v. Weidinger*, No. 09-10454, 2011 WL 6338864, at *11 (E.D. Mich. Dec. 19, 2011); *DIRECTV, Inc. v. Cavanaugh*, 321 F. Supp. 2d 825, 836 (E.D. Mich. 2003); *Romero v. Buhimschi*, No. CIV. 06-10859, 2007 WL 2902896, at *5 (E.D. Mich. Sep. 28, 2007). But these cases are not binding, and none of them explains how applying Michigan's pleading standard accords with Supreme Court precedent. Accordingly, the Court finds them unpersuasive and will apply the federal pleading standard.

Plaintiffs' allegations are sufficient to meet Rule 8's liberal pleading standard. The allegation that De Roo falsely told customers that Maurer committed theft provides Defendants fair notice of Maurer's claim. Defendants argue that the allegation that ITNA acted "through [De Roo] and others" (Compl. ¶ 225) is impermissible group pleading, but this argument fails. Plaintiffs bring a defamation claim against ITNA for the speech of its chief executive, De Roo, who has authority to speak on ITNA's behalf. No group pleading is involved.

In the alternative, Defendants contend that Maurer's defamation claim is outside the one-year statute of limitations. *See* Mich. Comp. Laws § 600.5805(11). "The statute of limitations is

an affirmative defense, and a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (citations omitted). However, the statute of limitations may be raised in a motion to dismiss if "the allegations in the complaint affirmatively show that the claim is time-barred." *Id.* Plaintiffs' complaint does not specify when the alleged defamation took place. Defendants argue that "[t]he Complaint elsewhere places de Roo's conduct in the context of events following Maurer's April 2023 removal, suggesting the statements were made at least nearly three years before this action was filed." (Defs.' Br. in Supp. 15 (citation omitted).) However, Plaintiffs also allege that ITNA "continues to" accuse Maurer of theft (Compl. ¶ 225), suggesting that the defamation has occurred more recently. More importantly, the fact that one may draw a (weak) inference that the defamation occurred around 2023 is not sufficient to "affirmatively show that the claim is time-barred." Again, Plaintiffs have no obligation to plead compliance with the statute of limitations. Thus, Defendants' argument is meritless.

**G. Breach of contract**

Plaintiffs aver that Defendants breached three contracts: a loan agreement, the 2018 agreement, and the 2019 agreement. Plaintiffs also assert that Defendants breached the implied covenant of good faith and fair dealing contained in the parties' various agreements. The Court will begin with this latter issue.

**1. Good Faith and Fair Dealing**

Defendants assert that Michigan law does not allow a claim for violation of the implied covenant of good faith and fair dealing. There is some support for Defendants' position in the case law. *See Acrisure, LLC v. Hudak*, 618 F. Supp. 3d 642, 648 (W.D. Mich. 2022) (collecting cases). However, the Michigan Supreme Court has recently clarified the issue as follows:

> [T]he Court of Appeals has held that there is no independent cause of action for breach of the implied covenant of good faith and fair dealing. *See, e.g., Belle Isle Grill Corp v Detroit*, 256 Mich App 463, 476, 666 NW2d 271 (2003). The Court of Appeals has instead viewed this implied covenant as an interpretive tool "by which contractual obligations or other statutory duties are to be measured and judged." *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 133, 839 NW2d 223 (2013). These principles track the Court of Appeals' longstanding holding that "[w]here a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." *Burkhardt v City Nat'l Bank of Detroit*, 57 Mich App 649, 652, 226 NW2d 678 (1975) (emphasis added). Naturally, then, the implied covenant of good faith and fair dealing under existing law "neither overrides nor replaces any express contractual term." *Bank of America, NA v Fidelity Nat'l Title Ins Co*, 316 Mich App 480, 501, 892 NW2d 467 (2016) (quotation marks and citation omitted).

*Kircher v. Boyne USA, Inc.*, No. 166459, --- N.W.2d. ----, 2025 WL 938147, at *3 (Mich. Mar. 27, 2025).[7] The Sixth Circuit has similarly noted that "[a]n implied covenant of good faith and fair dealing in the performance of contracts is recognized by Michigan law only where one party to the contract makes its performance a matter of its own discretion." *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003); *see also McLiechey v. Bristol W. Ins. Co.*, 408 F. Supp. 2d 516, 522 (W.D. Mich. 2006). In short, Plaintiffs may only state a claim for violation of the implied covenant of good faith and fair dealing if they point to a provision of the contract bestowing discretion upon Defendants and allege that Defendants exercised that discretion in an unfair manner. Accordingly, the Court will consider the good-faith-and-fair-dealing claims in conjunction with its analysis of specific contractual provisions below.

---

[7] The Supreme Court added the following footnote: "Because the parties agree with the legal principles espoused by the Court of Appeals, we need not define the contours of the implied covenant of good faith and fair dealing under Michigan law." *Kircher*, 2025 WL 938147, at *3 n.5. The Court interprets this footnote not as a suggestion that the Supreme Court might entirely reject the existence of an implied covenant claim, but rather as a means of preserving the possibility of a future change in the doctrine's details. In any event, the *Kircher* Court evidently believed that the cited Court of Appeals case law supports the existence of such a claim, and this Court is reluctant to diverge from the Court of Appeals' view on state law matters.

**2. Loan Agreement**

Plaintiffs allege that ITNA breached its loan agreement to Maurer when it stopped making monthly payments (after Maurer stopped paying the lease). The complaint states that CPI "agreed to loan" ISU (the predecessor to ITNA) $490,000 in 2018 or 2019. (Compl. ¶ 84.) In addition, the 2019 agreement states that "CPI will loan $512,965 to [ISU]," and separately that "[w]ithin the next 2 years . . . CPI should have provided a loan of $482,625 to [ISU]." (2019 Agreement 4.) The complaint also alleges that sometime after the 2019 agreement, "the long-awaited financing that [Van de Ven] again promised was structured so as to require Maurer to loan an additional $1.5 million to ITNA (from the sale and lease back of the Innovation Center), so that existing loans could be restructured and the balance of the construction loan for the Innovation Center could be repaid." (Compl. ¶ 132.)

Defendants argue that the 2019 agreement only contemplates a loan from CPI, not from Maurer personally, so Maurer cannot bring a claim for breach of the loan agreement. Plaintiffs assert that the loans were initially provided by CPI but later restructured as obligations to Maurer. However, the statement in the complaint that the parties restructured their loans is insufficient to establish that such a restructuring actually occurred. The existence of an agreement to restructure the loans is a legal question, and asserting that such an agreement existed is insufficient to state a claim in the absence of any underlying facts supporting the conclusion that a valid contract was formed. Thus, Maurer's breach of contract claim regarding the loan agreement will be dismissed.

**3. 2018 Agreement**

Plaintiffs argue that Defendants breached the 2018 agreement by (1) failing to pay royalties on i-mop sales to legacy accounts, (2) failing to market ISU's products, (3) failing to secure financing, (4) allowing Tennant to undercut CPI's prices so as to prevent Medline from buying

their i-mops, and (5) barring Maurer from accessing the Innovation Center. As explained below, none of these allegations establish a breach of contract.

*First*, Plaintiffs allege that Defendants agreed to pay royalties to CPI on i-mop sales to legacy clients, but later refused to sell to these clients. Defendants' refusal to sell to legacy clients does not technically violate its agreement to pay royalties—it made no sales, so it owed no royalties. But Plaintiffs are right that this refusal could violate the covenant of good faith and fair dealing, insofar as Defendants had the discretion to make any amount of sales to legacy clients and chose to make none so as to undermine CPI's business.

The more acute problem for Plaintiffs is that they have not sufficiently alleged the existence of a royalty agreement in the first place. The 2018 agreement does not specify any royalty arrangement for legacy clients. Plaintiffs assert that a more precise agreement was worked out later (but not written down). As explained above, the mere assertion that a contract exists is a legal conclusion, and the Court does not accept legal conclusions even at the pleading stage. Plaintiffs allege no facts supporting the existence of such an agreement. Plaintiffs note that the 2018 agreement recognizes "that CPI will keep a customer base but will not compete with Tenn[a]nt in selling i-mop to those legacy customers." (Pls.' Opp'n Br. 26, ECF No. 28.) However, there is a significant conceptual gap between CPI's maintenance of a customer base to Tennant's purported obligation to pay CPI royalties—a gap that Plaintiffs' complaint does not fill. Accordingly, Plaintiffs have not stated a breach of contract claim regarding the royalty agreement.

*Second*, Plaintiffs assert that Defendants promised to market ITNA's products but failed to do so. Again, this assertion falls short because Plaintiffs do not allege the existence of such a promise. The 2018 agreement states that "i-team global will centralize the global marketing from Eindhoven and will also work with the local USA team members." (2018 Agreement 4.) Despite

what Plaintiffs argue, the Court is not convinced that this sentence creates an affirmative duty for Defendants to market ITNA's products. It merely states that marketing will be centralized in Eindhoven, and that team members will work together. The agreement provides no grounds for finding that Defendants had any marketing obligations, so Plaintiffs have failed to state a claim for any breach of those obligations.

*Third*, Plaintiffs contend that Defendants violated their commitment to secure funding for ITNA from Rabobank. But this claim suffers from the same flaws as the previous one. The 2018 agreement provides that "i-team global will look to the possibilities to get [ISU] financed via Rabobank." (*Id.* at 5.) A promise to look into financing is not a promise that financing will actually occur. Thus, Defendants' failure to secure financing was not a breach.

*Fourth*, Plaintiffs argue that Tennant sold i-mops at such a low cost that CPI could not sell them to Medline, and that Defendants allowed this to occur. However, it does not appear that the 2018 agreement contains any provisions regarding CPI's right to sell i-mops to Medline, and Plaintiffs' conclusory allegations regarding a separate commitment are insufficient to establish the existence of a contract.

*Fifth*, Defendants did not breach the 2018 agreement by locking Maurer out of the Innovation Center. The agreement states that ITNA "will be co-renter of the new constructed building for 10 years." (*Id.* at 4.) It does not explicitly provide Maurer or CPI any right to use the building, although the implication of "co-renter" is presumably that CPI (as the owner of the building) will be the other tenant. Regardless, by 2023—when De Roo locked Maurer out— CPI no longer owned the building, and its right to use it was subject to the leaseback agreement, rather than the 2018 agreement. And Plaintiffs do not bring a breach of contract claim for the leaseback agreement.

In sum, Plaintiffs do not state a claim for breach of the 2018 agreement.[8]

**4. 2019 Agreement**

Finally, Plaintiffs allege that Defendants breached the 2019 agreement by (1) demanding changes to the Innovation Center, (2) failing to promote i-range products, (3) failing to pay ITNA's inventory costs, (4) charging some of Global's expenses and surcharges to ITNA, and (5) locking Maurer out of the Innovation Center. Again, the Court finds that Plaintiffs have not stated a breach-of-contract claim.

*First*, it is not clear what provision of the 2019 agreement would have been breached when Defendants added extra cost and time to the Innovation Center construction. The agreement certainly contemplated the existence of the Innovation Center, but it did not specify how much the project would cost; indeed, it specifically noted that "[p]arties will need to agree to the final cost . . . of the new building." (2019 Agreement 5.) Insofar as Van de Ven allegedly promised to pay for the extra costs and subsequently failed to do so, he perhaps breached that separate promise, but that promise was not in the 2019 agreement.

*Second*, Plaintiffs similarly do not clarify what contractual obligation was breached by Defendants' failure to promote i-range products. Under certain circumstances, Defendants' actions—including allowing Tennant to tell customers not to buy i-range products—could breach a covenant of good faith and fair dealing. But as noted above, such a covenant only exists if a contract provides a party with discretion to make particular choices. Because the 2019 agreement

---

[8] Defendants also argue that Plaintiffs' claims regarding the 2018 agreement are time-barred because the six-year statute of limitations excludes any claims that accrued before March 13, 2020, and any breach of the 2018 agreement must have taken place before the 2019 agreement, which superseded it. The Court agrees in part with Plaintiffs that the 2019 agreement does not necessarily supersede every aspect of the 2018 agreement. Resolving this issue requires a case-by-case inquiry regarding each provision of the 2018 agreement; the Court cannot perform that inquiry because, as explained above, Plaintiffs' breach-of-contract claims are not actually grounded in any provisions of the 2018 agreement.

does not specifically give Defendants discretion regarding the marketing of i-range products, there is no implied covenant to breach.

*Third,* Plaintiffs point to no provision of the 2019 agreement that obligated Defendants to pay ITNA's inventory costs.

*Fourth*, Plaintiffs do not identify any provision of the 2019 agreement that barred Global from charging its expenses to ITNA, or that provided Global with discretion to fulfill an expense-related obligation. Nor do Plaintiffs point to any obligation on Global's part to resell products to ITNA without a surcharge.

*Fifth*, the text of the 2019 agreement belies Plaintiffs' claim that "[t]he 2019 Agreement assured CPI full access as a co-tenant of the Innovation Center." (Pls.' Opp'n Br. 26.) The agreement refers to the Center and the parties' associated financial obligations, but does not say anything about the companies' rights to use the Center. Thus, Defendants' decision to lock Maurer out of the building did not violate the 2019 agreement.

*Finally*, in support of their breach-of-contract argument, Plaintiffs note that the 2019 agreement "gave CPI the right to its laundry business and to purchase equipment at cost [and] required compensation for surrendering Canadian distribution rights and[] payment of outstanding receivables to CPI." (*Id.*) However, Plaintiffs do not identify any breaches of these commitments.

In sum, Plaintiffs have failed to state any breach-of-contract claims.

**H. Conversion**

CPI brings a conversion claim against ITNA, alleging that its agent locked Plaintiffs out of the Innovation Center without allowing them to recover furniture, equipment, files, and personal property. Michigan law allows for both common-law and statutory conversion claims; CPI brings only the latter. "Conversion is defined as 'any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.'" *Lawsuit Fin.,*

*LLC. v. Curry*, 683 N.W.2d 233, 240 (Mich. Ct. App. 2004) (quoting *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (Mich. 1992)). A statutory conversion claim also requires alleging that the defendant converted the subject property to their "own use," which means that "the defendant employed the converted property for some purpose personal to the defendant's interests." *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 871 N.W.2d 136, 148 (Mich. 2015). Defendants raise several objections to CPI's conversion claim, which the Court will address in turn.

*First*, Defendants contend that Plaintiffs' description of the items that were allegedly converted—the "furniture, racks, forklifts, files [and] personal property" left in the Innovation Center (Compl. ¶ 141)—is too vague. But this allegation sufficiently puts Defendants on notice regarding the allegedly converted property. While the reference to files and personal property is somewhat unspecific, Defendants presumably are aware of what property Maurer left in his office, so they can readily infer which items Plaintiffs are referring to.

*Second*, Defendants argue that they cannot have committed conversion because they did not wrongfully take possession of Plaintiffs' property—rather, they were initially authorized to use the property when the building was shared. And they assert that conversion only occurs when the "initial exercise of domain over the property was in fact wrongful." *Acrisure*, 618 F. Supp. 3d at 649 (quoting *Lawsuit Fin.*, 683 N.W.2d at 240–41). But Defendants read the quoted language for more than it is worth. The *Lawsuit Financial* court explained that when a plaintiff loans money to a defendant, the plaintiff cannot later sue the defendant for conversion of the money if the defendant's initial exercise of domain was lawful (i.e., pursuant to the loan agreement). 683 N.W.2d at 240–41. That holding has no relevance here. And it does not disturb the general principle "that once a person's temporary right to use another's property expires, the continued

possession of that property" may constitute conversion. *Lothamer Tax Resol., Inc. v. Kimmel*, No. 1:25-cv-579, 2026 WL 2606291, at *2 (W.D. Mich. Sep. 3, 2026); *see also Aroma Wines*, 871 N.W.2d at 144 (noting that "refusing to surrender a chattel on demand" constitutes conversion); *Dep't of Health & Hum. Servs. v. NRK RX, Inc.*, No. 364206, 2024 WL 4846172, at *4 (Mich. Ct. App. Nov. 20, 2024) ("Refusing to return property to its owner upon demand can constitute an act of conversion."), *rev'd in part on other grounds*, No. 167917, 2026 WL 1656773 (Mich. June 8, 2026).

Here, ITNA has exercised domain over Plaintiffs' property by refusing to let them recover it. Thus, Defendants' argument that they cannot have converted CPI's property because they were initially authorized to use it has no merit. Defendants also note that the complaint does not explicitly state that Plaintiffs demanded the return of their property or that ITNA refused such a demand. But the complaint alleges that Van de Ven locked Maurer out of the Innovation Center and that "Maurer was not . . . permitted to remove any CPI/iTeam furniture, racks, forklifts, files or personal property from the Center." (Compl. ¶ 141.) This allegation sufficiently establishes ITNA's exercise of domain over CPI's property.

*Third*, Defendants argue that Plaintiffs have not sufficiently alleged that ITNA converted CPI's property to its own use. In response, Plaintiffs assert that ITNA "continue[s] [to] use . . . CPI's furnishings, racks, forklifts, and equipment in its ongoing business operations at the Innovation Center" (Pls.' Opp'n Br. 30), though they cite no corresponding allegations in the complaint. The only relevant allegation is the conclusory statement that "ITNA has denied CPI access [to] or use of its property, which ITNA has converted for its own use." (Compl. ¶ 245.) Even so, the Court is satisfied that Plaintiffs have established Defendants' conversion to their own use. CPI and ITNA were sharing both office space and employees; presumably, the furniture and

warehouse equipment were used by both. One can reasonably infer that when ITNA barred CPI from the space, ITNA continued to use the shared furniture and equipment. Therefore, ITNA converted the property to its own use.

*Finally*, although Plaintiffs' complaint lists only CPI as the plaintiff for the conversion claim, Plaintiffs also allege that iTeam owns some of the property that Defendants allegedly converted (*see* Compl. ¶ 141), and that the omission of iTeam from the conversion count was an oversight. Defendants argue that since iTeam is not explicitly included in the conversion count—and not listed in any other count—it should be dismissed from the case. However, the Court is satisfied that at this point Defendants are on sufficient notice regarding iTeam's conversion claim, and it would be an unnecessary formality to require Plaintiffs to amend their complaint merely to add iTeam's name to the conversion count heading.

**I. Replevin**

The final count of the complaint is styled as a claim for injunctive relief; in it, Plaintiffs seek an order requiring Defendants to allow Maurer access to the Innovation Center to recover his personal property. Defendants argue that no cause of action exists for generic injunctive relief. Plaintiffs respond that the claim is really one for specific performance, but specific performance is a contractual remedy, and Plaintiffs do not allege that Defendants' retention of Maurer's personal property constitutes a breach of contract. Instead, the Court interprets this claim as one for replevin, a common-law action that allows "recovery of the possession of goods unlawfully obtained or seized." *Lewis v. First All. Mortg. Co.*, No. 230089, 2004 WL 1365997, at *5 (Mich. Ct. App. June 17, 2004). Because Maurer alleges that Defendants have barred him from recovering the property they have converted, he sufficiently states a claim for replevin.

## IV. CONCLUSION

As explained above, the Court will grant Defendants' motion in part and dismiss Plaintiffs' claims for minority shareholder oppression and breach of contract. Plaintiffs' surviving claims are those for patent infringement, induced patent infringement, trademark infringement under federal and state law, unfair competition, defamation, conversion, and replevin.

An order will enter in accordance with this Opinion.

Dated: October 30, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE